RONALD H. AND DOROTHY A. AVERS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Avers v. Commissioner
Docket Nos. 12639-86; 12640-86; 12641-86; 12642-86; 12643-86; 26926-86.
United States Tax Court
T.C. Memo 1988-176; 1988 Tax Ct. Memo LEXIS 204; 55 T.C.M. (CCH) 678; T.C.M. (RIA) 88176; April 26, 1988. *204 Ps, individual investors, each invested in 1981 as partners in separate partnerships which were formed to exploit master sound recordings leased K as part of a program promoted by K. During settlement negotiations, respondent refused to offer Ps a deduction for 100 percent of their out-of-pocket expenses in relation to their 1981 investment in the K program, an offer which respondent previously extended to all 1979 and 1980 investors in the K program and extended to various other 1981 investors at the administrative stage. Held, the partnerships were "generic tax shelters" whose activities lacked economic substance, and respondent properly disallowed the deduction of Ps' distributive shares of their respective partnerships' lossses, deductions and investment tax credits. Rose v. Commissioner,88 T.C. 386 (1987). Held further, respondent did not violate Ps' constitutional rights under the equal protection component of the Fifth Amendment due process clause by refusing to offer Ps the same settlement proposal for 1981 that was previously extended to other investors in the K program for 1981 or prior years. Held further, (1) Ps are liable for additions to tax pursuant to sections *205 6653(a)(1) and (a)(2), I.R.C. 1954. (2) Ps are liable for the addition to tax pursuant to section 6659, I.R.C. 1954. (3) Ps are liable for the increased rate of interest provided in section 6621(c), I.R.C. 1986. David P. Ruwart, James L. Allen, and Patrick J. Alandt, for the petitioners. Jacqueline M. Hotz and Beth L. Williams, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to the provisions of section 7456(d)(3) of the Code (redesignated section 7443A(b)(3) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: These consolidated "test case petitioners" were selected *206 by counsel and approved by the Court to serve as test cases for resolving numerous issues in connection with a much larger group of individuals who invested during 1981 in the master sound recording leasing program offered by the Koala Record Company (Koala). Koala offered similar programs in 1979 and 1980, but the present cases involve issues relating only to petitioners' respective investments in the 1981 Koala program. Appendix A sets for the test case petitioners by name and docket number, the taxable years involved, and the deficiencies and additions to tax for each year as determined by respondent. In his respective answers, respondent also alleges that petitioners Avers, Dickerson, Hilton and Parenti are liable for interest on underpayments of tax calculated at the higher rate provided in section 6621(c) (formerly section 6621(d)) [3] for each of the taxable years involved. The issues for decision are (1) whether petitioners are *207 entitled to their distributive share of partnership deductions, lossses and credits with respect to master sound recordings leased in 1981; (2) whether respondent denied petitioners equal protection of the laws by refusing to extend to them for 1981 the same settlement offer extended to certain other Koala investors for 1981 or earlier years; (3) whether petitioners are liable for additions to tax under section 6653(a); (4) whether petitioners are liable for the additions to tax under section 6659; and (5) whether petitioners are liable for the increased rate of interest provided in section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference. Appendix B lists petitioners by name and docket number, their place of residence at the time they filed their respective petitions, and the Internal Revenue Service Center with which they filed their 1981 Federal income tax returns. Background of the promotion
Koala was a corporation formed in 1979 by Wesley E. Sanborn (Sanborn) for the purpose of leasing, promoting, manufacturing and distributing master sound recordings and the records and tapes *208 produced therefrom. At all times relevant, Sanborn was the president and sole shareholder of Koala. Sanborn is a CPA who, beginning in 1976, operated a wholly-owned corporation called Sanborn & Associates, Inc., through which he offered such services as investment analysis, tax planning and consulting for tax shelter programs. In 1979, Sanborn incorporated Bullett Production Company (Bullett). [4] Robert M. Schmidt (Schmidt) was president of Bullett at all relevant times. Schmidt is an attorney who, on January 3, 1980, incorporated JEY Production Company (JEY) and served as its president at all relevant times. [5]
R. W. Klein (Klein) and Robert LaBine (LaBine), among others, were retained as commissioned salesmen to sell interests in the Koala master sound recording program. LaBine promoted the Koala program through Professional Associates, an unincorporated association he formed in *209 1975 for the purpose of offering financial planning advice. Through Professional Associates, LaBine promoted the Koala program in 1979 and 1980, as well as in 1981. During the promotional seminars which he conducted throughout 1981, he emphasized the tax aspects of the investment. Salesmen received a training manual prepared by Sanborn which they used in promoting the Koala program in 19981. The manual includes a four-page document entitled "ACCOUSTICAL ACCUMULATOR (Master Sound Recordings) LEASING PROGRAM 1979" (training material) which explains the advantages of the Koala program almost exclusively in terms of tax benefits. The only reference to economic benefit is a statement that the return per record or tape sold is 20 cents, requiring sales of 80,000 units in order to recover a $ 16,000 investment. Nevertheless, salesmen were to alert prospective investors of the "risk" that the 20 cents return per unit would be subject to Federal income tax. This four-page document is preceded by a one-page summary which lists the following "advantages" and major selling points of the Koala program. (1) It may have the distinction of being the only program with a favorable Revenue Ruling. *210 [6]
(2) No recapture of depreciation or Investment Tax Credit problems. (3) Excellent leverage of 4.1 to 1. (4) Buy $ 33,000 cash benefits for $ 16,000. (5) Buy $ 66,000 effective deductions for $ 16,000. (6) One time payment. (7) No notes to sign, no take outs, etc. (8) Simple to report to the IRS, all necessary tax information included in summary sheets for your returns prepared. (9) Carry back and forward tax credit benefits if needed for those years where disallowance might have happened.
Also contained in the training manual is an eight-page tax opinion prepared by Schmidt based on facts and information as supplied by Sanborn. Although it is unclear from the record exactly what promotional materials were distributed to each of the 1981 investors, it is clear that some investors received a seven-page document captioned "ACCOUSTICAL ACCUMULATOR (Master Sound Recording) LEASING PROGRAM" (promotional material). The facts, as stated in the promotional material, include the following: 10. Koala, a wholly owned *211 subsidiary of Sanborn [& Associates, Inc.] will enter or has entered into Agreements with various Production Companies ("Seller") to purchase Masters. * * * The Master is for use in the United States only, and it is a configuration [7] that has never before been used commercially. The Purchase Agreement is accompanied by a Bill of Sale transferring legal title, and the balance of the purchase price is secured by a Security Agreement in an arm's length transaction. * * * 13. None of the respective entities or persons, the production companies, the buyer-Lessor (Koala), the Lessee, or the distributors are affiliated or related to each other and there are no common officers, directors or controlling stockholders. 14. Koala, in advance of its purchase, will secure two (2) appraisals for each Master *212 from two unrelated appraisers, each of whom will be a recognized expert in the record industry. Each appraisal will be based upon the factors considered by the Internal Revenue Service to be relevant in valuing artistic properties such as Masters. 15. Each Lessee is entering into the lease with the dominant, controlling and impelling motivation of realizing an economic profit. [Emphasis in original.] The promotional material also includes financial data similar to that set forth in the salesmen's training material. The only reference to economic benefit is a bare statement that anticipated sales over the seven year lease term is 300,000 units. The tax benefits, on the other hand, are displayed on over one-half of a page as follows: 1st Year
10T Investment Tax Credit (ITC)     * *213 $ 25,000
1st Year Lease Deduction      ** $ 10,000
assume a 50% tax bracket     50%
5,000
First Year Tax Benefits        $ 30,000
2nd thru 7th Year
$ 1,000 per year     $ 6,000
assume a 50% tax bracket     50%
3,000
Total Tax Benefit        $ 33,000
1981 Investors
Before investing in the Koala program in 1981, none of the petitioners listened to any of the master recordings ultimately leased, examined appraisals for any of the master recordings leased, sought independent appraisals for those masters or sought the advice of anyone with expertise in the music or record industry as to the merits of leasing master sound recordings. No petitioner had any experience in the music recording industry. Walter L. Hilton
At all times relevant, petitioner Walter L. Hilton (Hilton) was a landlord, and his wife worked in a personnel office. Hilton first heard of Koala in 1980 when he attended a promotional seminar presented by Klein and received a copy of the promotional material described previously. After meeting with Klein a second time, Hilton consulted his accountant concerning the tax benefits to be derived from leasing master recordings. Hilton invested in the Koala program in 1980 and, without any further investigation, again in 1981. Robert V. Parenti
Petitioner Robert V. Parenti (Parenti) is an attorney who has been engaged in the general practice of law for over 35 years. He first learned of Koala *214 in 1979 from his accountant, Klein. After discussing the promotion with his broker, Parenti decided to invest in 1979. Without any subsequent investigation, he also invested in 1980 and 1981. James H. Tellam
In 1981, petitioner James H. Tellam (Tellam) was a civil engineer, and his wife was a regional manager for H&R Block, an income tax return service. They became interested in the Koala program after accompanying a friend to a promotional seminar presented by LaBine in 1981. Tellam then consulted his investment advisor, who had no experience in, or knowledge of, the music or recording industry. Without making any inquiries of her own, his wife concluded that the program looked sound as to the tax aspects. Tellam thereafter invested in the Koala program in 1981. Dale E. Zingg
At all times relevant, petitioner Dale E. Zingg (Zingg) was an employee and an officer of a corporation called Metal Specialites. Zingg first heard of the Koala program from Robert Line (Line), a CPA, co-worker and treasurer of Metal Specialties. Relying solely on Line with respect to all aspects of the promotion, Zingg invested in the Koala program in 1979 and 1980, as well as in 1981. Line, however, *215 had no experience in the music or recording industry and, in turn, relied on representations made to him by Klein and Sanborn. Line also visited Koala's facilities in Tennessee and Michigan. Donald Boyd
Although Donald Boyd (Boyd) is not a test case petitioner, his activities in investing in the 1981 Koala program are noteworthy because he was the managing agent of Datura Distributing Co., a test case partnership. At all times relevant, Boyd was an employee of General Motors and had no experience or background in the music or recording industry. Boyd first learned of Koala in 1980 when he attended a promotional seminar presented by Klein and received a copy of the promotional material previously described. After subsequent meetings with his accountant, an H&R Block representative and Klein to discuss the tax aspects of the Koala program, Boyd sent a copy of the promotional material to the Taxpayer Service Division of the Internal Revenue Service's Detroit District offices, inquiring as to the tax benefits claimed in that material. In response to his inquiry, Boyd received a letter from the Taxpayer Service Division dated November 13, 1980, the pertinent part of which reads as *216 follows: Dear Mr. Boyd: This is in response to your inquiry to our office concerning the tax benefits derived from the leasing of a Master Recording Disk. The information in the [promotional material] is basically correct as regards the federal income tax consequences. The disk, having a useful life of 12 years and a fair market value of $ 250,000 is leased for a period of 7 years. * * * The only exception we take to the claims set forth in the pamphlet is regarding the timing of the deduction for advance lease payments. The Internal Revenue Service and the courts have generally held that advance rental payments must be amortized over the life of the lease.
Boyd invested in Koala in 1980 and, without further investigation, invested again in 1981. Organization
Upon investing in the program, individuals signed organizational documents whereby they entered into partnerships which would lease master recordings from Koala. Sanborn and the salesmen of the Koala program designated a managing agent for each partnership [8] and assigned approximately 12 to 14 investors to each partnership. With the exception of those who invested in the partnership RECO Enterprises, investors had no input *217 into the selection of the managing agent, the partnership to which they were assigned to or even the name of the partnership invested in. Investors did not even know the identity of any other investors in the same partnership. RECO Enterprises was a "co-partnership" whose managing agent was elected by its partners: Zingg, Line and other employee-officers of Metal Specialities. The partnerships and managing agents in these test cases are: Petitioner
Partnership invested in
Named managing agent
Avers
Datura Distributing Co.
Donald Boyd
Dickerson
Almond Leasing
Professional Associates
Hilton
Wahoo Equipment Dist. Co.
Paul Sute
Parenti
Sherry Distributing Co.
Peter J. Marretta
Tellam
Filbert Leasing
Professional Associates
Zingg
RECO Enterprises
Robert Line The investor-partners were *218 strictly passive investors, had no duties or responsibilities relating to the partnerships, and relied exclusively on the managing agents to conduct the affairs of their respective partnerships. None of the managing agents, however, had any experience in the music industry prior to their involvement in the Koala program and acted as mere conduits through which Sanborn passed information to the investors. The managing agents performed primarily administrative tasks, such as preparing tax returns for the partnerships, distributing money and signing documents. Selection and lease of master recordings
After entering into partnerships, investor-partners indicated the master recordings they preferred from a list of masters. The list included the names of the artists and the titles of the masters, but excluded the titles of the individual songs contained on each master recording. None of the investors listened to any of the master recordings chosen prior to making their selections, and there was no guarantee that any of the masters requested would be received. In fact, the determination as to which masters would actually be leased to which partnerships was made by Sanborn and the various *219 salesman, who only relied on investor-partners' preferences as a guideline in assigning masters. [9]
In 1981, Koala leased approximately 870 master recordings, 39 of which were leased to the six test case partnerships. For each master recording leased from Koala, the respective partnership executed a "NON-EXCLUSIVE LEASE" (lease), [10] *220 the terms of which were non-negotiable. The leases identified the masters only by lease number and artist or master title, while failing to include such information as the song titles or length of play. Pursuant to the leases, Koala purported to convey nonexclusive rights to commercially exploit the masters in the United States for a period of seven years and one month. Each lease further provides as follows: 11. DEFECTS: If there is a material defect in the master recording and/or its title and lessor determines the problem adversely affects its representations thereunder, lessor shall substitute a master recording of equal value from lessor's inventory. * * * 15. LESSOR HAS TITLE: Lessor warrants that he has purchased the Master Recording described hereinbefore and holds title to the same. Said purchase price was $ (Koala's purchase price).
16. WARRANTY: The lessor warrants that the master recording has not been previously released in its present configuration. In addition to the stated fixed rental payments required over the term of the lease, [11] the lease also requires the lessee-partnerships to pay a rental fee equal to 65 "percent of cash received from subleases, distribution agreements or other revenue producing ventures." The leases fail to specify which party is responsible for, or the amount of, producers' royalties, artists' royalties, mechanical royalties, union fees, manufacturing costs or distribution costs. For each master recording leased, Sanborn elected, on *221 Koala's behalf, to pass-through to the respective lessee-partnerships any investment tax credit relating to that master. Distribution and promotion of master recordings
Simultaneous with the execution of a lease, each partnership entered into a "NON-EXCLUSIVE LEASING AGENCY AGREEMENT" (sales agency agreement) with Music Business Services, Inc. (MBSI). These non-negotiable agreements were drafted by Sanborn and operated to appoint MBSI as the partnerships' agent to manufacture, distribute and promote the records and tapes produced from the leased masters. MBSI was incorporated in 1980 by Thomas Nelles, an accountant with no prior experience in the music industry or in the promotion, distribution or marketing of records and tapes. Sanborn and Schmidt recruited Thomas Nelles to form MBSI and convinced him to pre-sign the sales agency agreements so that those agreements would be available to bind investors at the time leases were executed. Thomas Nelles knew little about Koala and almost nothing about the rights held by the partnerships under the leases. J. R. Williams was responsible for MBSI's sales and distribution operations, but was employed and paid for Koala. MBSI produced *222 only budget records and tapes, and distributed them through "rack-jobbers" rather than through record stores or major retail outlets. The term "rack-jobber" refers to a method of distribution by which racks of approximately 144 records or tapes are set up on a consignment basis to merchants of small retail establishments such as convenience stores, drug stores, gas stations and grocery stores. As to the master recordings leased in 1981, no sales occurred during that year and no statement or sales report was ever prepared by MBSI. [12]
The master sound recordings
Throughout the latter half of 1981, Sanborn negotiated for the purchase of the master sound recordings in issue from various individuals and record companies. [13] Although delivery of the master recordings was to be made to Koala, Sanborn arranged for the sales to be made either to Bullett or JEY, rather than directly to Koala. Koala then purchased *223 the masters from Bullett and JEY[14] by paying a cash down payment, giving a promissory note for the balance of the purchase price, and issuing a security agreement for each master recording. Appendix C sets forth the date of sale to Koala, together with the amount of Koala's purchase price, cash down payment and promissory note for each of the 39 master recordings leased by the partnerships in these test cases. The cash down payments range from $ 1,000 to $ 10,000 per master recording and equal the total purchase price previously paid by Bullett or JEY for the related master recordings. The promissory notes, by sharp contrast, generally range in amounts from $ 245,000 to $ 747,000 per master. The notes all require Koala to make, "in any event," a lump-sum payment of the unpaid balance of the purchase price (plus interest at nine percent per annum) to Bullett or JEY in 12 years from the data the notes were executed. The security agreements grant Bullett or JEY a security interest in both the master recordings and any "proceeds derived from the sale, use or exploitation thereof." Koala also received bills of sale from Bullett or JEY purporting to transfer "full and unencumbered" title *224 to the master recordings. Koala received delivery in 1981 of few, if any, of the master recordings it purchased and leased in that year. Consequently, most, if not all, masters were unavailable in 19981 to Koala, the partnerships or MBSI. Even after Koala finally received all the masters in 1982, it liberally substituted masters from its inventory for certain leased masters about which serious questions had arisen concerning their quality and/or title. These replacements were made without prior notice or warning from Koala and were not subject to the approval of managing agents or investor-partners. Substitutions were made for 144 of the roughly 870 master recordings leased from Koala in 1981, including seven of the 39 masters involved in the test cases. Many of the masters leased in 1981 also contain songs which had been *225 previously released. [15] Furthermore, of the 39 test case masters, at least 17 contain songs which Koala also leased to other partnerships in 1981, and at least three were neither recorded nor produced in the United States. [16]
Appraisals of the master recordings
Sye Mitchell, Robert E. Scherl and Timothy O'Brien were retained by Sanborn to prepare appraisals for the master recordings leased from Koala in 1981. Robert E. Scherl had never prepared any appraisals prior to his association with Koala. He operated with the understanding that the appraisals were merely a formality and were only necessary *226 in order for Koala investors to justify related tax benefits. He was given sample language to use in his appraisal letter, a list of masters, tape samples and Koala's total purchase price. Mr. Scherl was unaware of the definition of the term "fair market value," and understood that he was to appraise each master at Koala's purchase price for that master if he determined it could potentially generate revenues from worldwide sales (over a period of at least seven years) equal to that price. He further understood that if he appraised any master at an amount less than Koala's purchase price, then he was not to submit, or be paid for, that appraisal. Robert E. Scherl often received batches of 75 to 100 master recordings at a time. Because he did not have time to listen to each master in its entirety before appraising it, he only listened to segments of each master. There were even occasions when he performed appraisals without having listened to any portion of a master. His appraisal letters do not identify any of the masters by title or lease number, but merely refer to each master as "the album you have submitted to me." Contrary to Koala's promise in its training material and promotional *227 material to secure two appraisals per master in advance of each purchase, [17] only seven of the 39 test case masters have to appraisals, 15 masters have only one appraisal and 17 masters have none. None of the investors saw appraisals either before they invested in the Koala program or, even later, before they selected the masters they hoped to lease. Claimed deductions, losses and credits
Petitioners reported their share of partnership deductions, losses and credits on their 1981 Federal income tax returns by relying on Schedules K-1 (Form 1065) which were prepared by Sanborn and/or LaBine rather than by the partnerships' managing agents. Appendix D sets forth the distributive share of partnership items claimed by each petitioner on his 1981 tax return for his 1981 investment in the Koala program. After petitioners had filed their 1981 returns, petitioners Avers, Parenti and Tellam each filed a Form 1045, Application for Tentative Refund [18] and later filed Forms 1040X, *228 amended returns, for 1981. [19] Tellam subsequently attempted to withdraw his Form 1045 and filed a second amended return for 1981. By separate deficiency notices, respondent disallowed each petitioners' claimed partnership deductions, losses and credits with respect totheir investments in the master recordings. Respondent also determined additions to tax for negligence under sections 6653(a)(1) and (a)(2), and for valuation overstatements under section 6659. As to petitioners Tellam and Zingg, respondent further determined the higher rate of interest provided in section 6621(c) for substantial underpayment of tax attributable to tax motivated transactions. In his answers, respondent also seeks to apply the section 6621(c) interest rate to petitioners Avers, Dickerson, Hilton and Parenti. Investigation and settlement
In 1981, the Koala program was identified at the Internal Revenue Center in Cincinnati as a "potentially abusive tax shelter." Consequently, the Koala program was assigned to the *229 Internal Revenue Service's (the Service's) offices in Detroit for further investigation. Respondent allowed investors in the 1979 and 1980 Koala programs to settle their cases based on deducting 100 percent of their out-of-pocket expenses. With respect to investors in the 1981 Koala program, the Service's Detroit office arrived at a settlement position by which respondent would allow a deduction of 60 percent of out-of-pocket expenses incurred in that year. However, before the 1981 settlement position was communicated from the Detroit office to the Service's other district offices nationwide some revenue agents at the administrative level of various districts continued to extend that 100 percent out-of-pocket settlement offer in approximately 125 cases involving 1981 Koala investors. Respondent subsequently decided to honor the 100 percent out-of-pocket deduction settlement offer in those approximately 125 cases because of the taxpayer's reliance on that offer in agreeing to settle their cases. OPINION The ultimate issue to be decided herein is to what extent, if any, petitioners are entitled to their distributive share of partnership losses deducted, lease payments deducted and *230 investment tax credits claimed in relation to master sound recordings leased from Koala in 1981. Respondent advances an array of arguments in support of disallowing the claimed deductions, losses and credits. Respondent's principal argument, however, is that those items arose out of leasing activities not engaged in for profit. Petitioners maintain that they invested in their respective partnerships in good faith with the bona fide objective of making a profit, and that the partnerships' activities were engaged in with the primary and predominant purpose and objective of making a profit. Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933); Golanty v. Commissioner,72 T.C. 411, 426 (1979). The expectation of making a profit need not be reasonable so long as there is a bona fide objective to realize a profit. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,737 F.2d 5-7, 9 (3d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984). *231 In this context, "profit" means economic profit, independent of tax savings. Seaman v. Commissioner,84 T.C. 564, 588 (1985), Surloff v. Commissioner,81 T.C. 210, 233 (1983). Where an investment is made through a partnership, the law is clear that the analysis of profit objective must be made at the partnership level. [20]Fox v. Commissioner, supra at 1006; Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 11th Cir. (1984). In determining a partnership's profit objective, we focus on those individuals who actually conducted the partnership's affairs and who were relied on in making partnership decisions. Fox v. Commissioner, supra at 1007-1008; Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); Siegel v. Commissioner, supra at 698; Brannen v. Commissioner,78 T.C. at 512; Hager v. Commissioner,76 T.C. 759, 784 (1981). In the present cases, therefore, our attention must be focused on the promoters and managing agents. In considering petitioners in their capacity as partners, it is important to bear in mind that they relied completely upon others to form and manage the partnerships, to monitor distribution and *232 promotion of the master recordings, and to conduct the overall affairs of the partnerships. See Fox v. Commissioner, supra at 1008. [21]
At trial, the parties argued *233 the issue of profit objective in terms of the subjective test of section 183.[22] *234 The regulations promulgated under that section provide that greater weight is to be given to objective factors and also list a series of nonexclusive factors to consider in determining one's subjective intent. Section 1.183-2, Income Tax Regs.; [23] *235 Jasinowski v. Commissioner,66 T.C. 312, 321 (1976). However, in Rose v. Commissioner,88 T.C. 386 (1987), this Court adopted an objective test under which transactions involving "generic tax shelters," as we find in this case, are disregarded if they are found to be devoid of economic substance. This test incorporates the objective factors found to be relevant in cases decided under section 183, as well as concepts underlying sections 38, 162, 167 and 212. For the reasons set forth below, we find the partnerships' leasing activities lacked economic substance and that petitioners, therefore, cannot enjoy the tax benefits claimed by investors in the Koala master recording tax shelter. [24]
Generic tax shelter
A "generic tax shelter" *236 is defined as a tax shelter posssessing come or all of the following characteristics: (1) tax benefits are the focus of the materials used to promote the program; (2) the investors accepted the price and terms of the leases without negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract, and substantially overvalued in relation to the tangible property included as part of the packages; (4) the tangible assets were acquired or created at relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes nonrecourse in form or in substance. Rose v. Commissioner, supra at 412. In cases having these characteristics, tax motivation is apparent, and it is necessary to determine whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits. Rose v. Commissioner, supra.
Tin the instant cases, the promotional material highlighted the tax benefits. Although the record is not clear as to whether all petitioners received the promotional material, we are convinced that whatever information they did receive focused almost exclusively *237 on the tax aspects of investing in the Koala program. The salesmen's training manual concentrates on tax advantages, an approach similarly reflected in the presentation of promotional seminars. Consequently, there is no doubt that the promotion of the Koala program, either written by way of promotional material or oral by way of seminar, focused on tax benefits. Furthermore, petitioners did not negotiate the terms of either the leases or the sales agency agreements; the master recordings were acquired by Bullett or JEY shortly before the transactions in question for relatively small amounts; the masters were drastically overvalued; and investors failed to receive any clear evidence of Koala's title or ownership. As discussed in more detail later, the bulk of the consideration paid by Koala to Bullett or JEY for the masters was deferred by valueless promissory notes, even though no notes were involved in the leasing of those masters from Koala to the partnerships. Despite the absence of nonrecourse notes at the partnership level, petitioners' 1981 investments in the subject masters involve, at least to some extent, all of the above characteristics. Therefore, the tax motivation *238 behind investing in this generic tax shelter is apparent, and we turn to the determination of whether a sufficient business purpose existed. Lack of economic substance
Under the unified approach of Rose, the following factors have been considered in determining whether an activity is devoid of economic substance: (1) the lack of arm's-length dealings; (2) petitioners' investment activities; (3) projected revenues versus tax benefits; (4) the relationship between fair market value and price; (5) the structure of the financing; and (6) perceived Congressional intent. See Patin v. Commissioner,88 T.C. 1086, 1117-1122 (1987); Rose v. Commissioner, supra at 415-422. [25] Based on the entire record, the facts do not support an objective finding that the transactions herein had a business purpose. 1. lack of Arm's-Length Dealings
The absence of arm's-length negotiations is a key indicator of a transaction's lack of economic substance. Rose v. Commissioner, supra at 416; Helba v. Commissioner,87 T.C. 983, 1005-1007 (1987). The record discloses that no attempt was made by any investor-partner or any managing agent to negotiate the *239 lease price or terms for the master sound recordings at issue. None of the investor-partners or managing agents had any experience in the music industry or made any effort on behalf of any partnership to verify the reasonableness of the lease terms. See Helba v. Commissioner, supra at 1005. [26] Although petitioners' blind acceptance of the lease terms, by itself, is persuasive evidence of the lack of arm's-length dealings, Rose v. Commissioner, supra at 416, we take this opportunity to note the existence of evidence indicating the lack of arm's-length dealings at every level of the Koala program. To begin with, Sanborn negotiated and orchestrated both the original purchases of the masters by Bullett or JEY and the subsequent sale of those masters to Koala. Also, in conjunction with Sanborn, the commissioned salesmen formed the Koala partnerships, assigned partners and managing agents to those partnerships, and selected the master recordings that were substituted for leased masters in instances where title or quality questions arose. Neither the selection nor the substitution of master recordings were subject to the approval *240 of investor-partners or managing agents. As a result, neither the partners nor the partnerships negotiated for even the particular masters they would lease, much less the terms of the lease. Further, as to distribution of the leased masters, Sanborn arranged to have pre-signed, non-negotiable sales agency agreements with MBSI available for investors at the time they entered into their respective leases. MBSI was formed by Thomas Nelles at Sanborn's direction, and its sales and distribution operations were run by J. R. Williams, a Koala employee. Additionally, Sanborn participated in the preparation of Schedules K-1 which specified each partner's allocable share of their respective partnerships' deductions, losses and credits. In sum, the record is rife with evidence of a complete lack of arm's-length dealings, not only with respect to the leases entered into by the partnerships, but also with respect to the various transactions involved in the entire Koala program. 2. Petitioners' Investment Activities
In searching for business purpose, we must examine the objective facts surrounding petitioners' activity in light of their claim of being engaged in a profit-seeking endeavor. This *241 Court will find that a transaction has no valid business purpose where there exists little reason, apart from the significant tax benefits, for entering into the transaction. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Patin v. Commissioner, supra at 1118. In the instant cases, petitioners claim to have been both motivated by the profit potential which the program appeared to offer and lured by the glitter of the music entertainment industry. Respondent argues, and we agree, that petitioners' actions merely reflect a concern for tax benefits. First, we disagree with petitioners' contention that their pre-investment investigation into the profit potential of the program equalled or exceeded that required of reasonable and prudent investors. The record demonstrates petitioners' total indifference to the Koala program's chances for economic success. None of petitioners or managing agents had any experience in the music recording industry. Before investing in the Koala program in 1981, none of petitioners listened to any of the master recordings ultimately leased, examined or independently verified the *242 validity of appraisals for any of the leased masters, or sought independent appraisals for those masters. At no time did petitioners seek the independent advice of anyone familiar with the music or record industry concerning the economic viability of the Koala program or even the merits of leasing a master recording. [27]
After meeting with salesman Klein, petitioner Hilton merely consulted his accountant concerning the tax benefits to be derived from leasing master recordings before investing in the Koala program. Similarly, petitioner Parenti, an experienced attorney of over 35 years, simply referred to his accountant and broker before investing. Petitioner Tellam conferred with his investment advisor who, likewise, had no experience in, or knowledge of, the music or record industry. After Tellam's wife, a regional manager for H&R Block, concluded that the tax aspects of the promotion looked favorable, Tellam *243 invested in the Koala program in 1981. Petitioner Zingg, an experienced businessman, invested in RECO Enterprises in 1981. With respect to all aspects of the promotion, Zingg relied solely on RECO Enterprise's managing agent, Line, who is also a co-worker and treasurer of Metal Specialties. Line, in turn, relied on representations made to him by Klein and Sanborn. Although Line visited Koala's facilities in Tennessee and Michigan, we view those trips as nothing more than additional instances in which Line relied on the promoters' representations regarding the Koala program since tours through the facilities were all conducted by Sanborn or his agents. Line had no experience in the industry. Consequently, he did not know what to look for during his visits, how Koala compared to other record companies or what conclusions to validly draw from Koala's operations. Although Donald Boyd is not a test case petitioner, he was an investor in the Koala program and was the managing agent for one of the test case partnerships, Datura Distributing Co. As did countless other investors, Boyd met with an accountant, an H&R Block representative and Klein to discuss the tax aspects of the promotion. *244 Boyd went one step further, however, and also inquired of the Taxpayer Service Division of the Service's Detroit District offices as to the promotion. While petitioners maintain that nothing more can reasonably be expected of any investor under the circumstances, we are not satisfied by this inquiry. The Taxpayer Service Division's letter clearly reflects the fact that Boyd's inquiry, and their response, only addresses the tax benefits derived from the leasing of a master recording. Additionally, the Taxpayer Service Division was asked to base its conclusion solely on the promotional material prepared by Sanborn while assuming the correctness of the facts and information stated therein. Therefore, we simply do not believe that petitioners would enter into profit motivated transactions with independently investigating the economic viability of the proposed venture. Only the promised 4.1 to 1 tax deduction can adequately explain petitioners' entry into the Koala program under such circumstances. See Patin v. Commissioner, supra at 1119; Rice's Toyota World, Inc. v. Commissioner, supra at 202. In addition to petitioners' lack of adequate pre-investment investigation, petitioners also *245 exhibited both a complete lack of concern about exactly what they leased and a complete indifference to the success or failure of the venture. Upon investing, petitioners merely indicated the masters they hoped to lease rights in, but did not know which master recordings their partnerships would actually be assigned. Various masters were substituted without prior notice to, or approval by, either the managing agents or the individual investor-partners. The leases identify the masters only by lease number and artist or master title, but fail to even include song titles. The leases also fail to specify which party is responsible for, or the amount of, producers' royalties, artists' royalties, mechanical royalties, union fees, manufacturing costs or distribution costs. Additionally, petitioners possessed nonexclusive rights to the leased masters, did not inquire as to Koala's ownership of the masters, and did not seek a legal opinion concerning title to those masters. Even a cursory review of Koala's records would have turned up glaring gaps in the master recordings' chain of title. [28] Furthermore, petitioners never made any effort to ensure that they were being represented by a *246 competent distributor intent on producing revenues. Petitioners retained MBSI without ever making any attempts to learn anything about it or Thomas Nelles, who had no experience in the music industry or in the promotion, distribution or marketing of records and tapes. We can find no reason why anyone with a bona fide profit objective would so casually invest such substantial amounts of money to lease unidentified master recordings under such uncertain and vague terms. Further, the activities in question were not conducted in a businesslike manner. The petitioners' roles in *247 the activities of their respective partnerships were those of strictly passive investors. They neither possessed nor exercised any actual power over the affairs of their respective partnerships. [29] *248 Petitioners relied solely on the managing agents to handle all partnership affairs, and the managing agents relied on Sanborn and Koala as to everything other than administrative matters. Petitioners' and the managing agents' infrequent attention to the partnerships' activities clearly does not reflect the level of concern which normally attends business activities and losses of such substantial investments as are involved in these cases. We add that it is obvious from the inability to exploit the leased masters that the partnerships would not realize a profit from their exploitation. [30] The leases involved purported to convey only nonexclusive rights to exploit the corresponding master recordings. As a result of Koala's practice of duplicating masters, a partnership was in competition with both Koala and other Koala partnerships which possed rights to the same masters. Additionally, the record does not reflect any activity on *249 the part of MBSI to distribute or promote the leased masters. We must, however, acknowledge the existence of some evidence of subsequent efforts to generate sales of tapes and records. Claiming dissatisfaction with MBSI's efforts, the managing agents formed a new corporation in 1982 to merchandise and sell record products. [31] Whereas petitioners claim that these efforts reflect continuing attempts to realize profit on the distribution of records and tapes, we find this evidence susceptible to a different interpretation. While it may be sheer coincidence, we cannot help but notice that these efforts to exploit the masters came after it became known that the Koala program was identified by respondent as a "potentially abusive tax shelter." Under the circumstances, we cannot overlook the distinct possibility that these subsequent distribution efforts, not shown to be significantly more successful than the efforts made during 1981, were undertaken primarily to protect the anticipated tax benefits. In any event, we are not persuaded that these activities with respect to the new company prove that the partnerships had an actual and honest *250 profit objective at the time they leased any of the master recordings in question. As we stated in Flowers v. Commissioner,80 T.C. 914, 941 (1983): Where, as here, the promised tax benefits are suspiciously excessive and the transaction as a whole is entered into and carried out with a complete indifference to profit, it is clear what the parties intended to accomplish * * *. 3. Projected Revenue Versus Tax Benefits
The salesmen's training material and the promotional material project both the revenue and tax benefits with respect to the partnerships' exploitation of the master sound records at issue. These materials reveal that the ventures' anticipated tax benefits far exceed their projected income. The stated tax benefits include: no depreciation recapture problems; leverage of 4.1 to 1; $ 66,000 of deductions for every $ 16,000 invested; deductions of lease payments; and carryover tax credit benefits. In comparison, the only reference to economic benefit is a statement that anticipated sales over the seven year lease term is 300,000 units. This bald sales projection, however, is purely hypothetical and unfounded, and is not accompanied by an explanation *251 or justification. [32] In 1981, petitioners reported their allocable share of partnership losses, deductions and credits as set forth in Appendix D but, not surprisingly, reported zero gross receipts and sales for that year. [33] These facts further lead us to believe that petitioners' investments were paid for the purchase of anticipated tax benefits to offset their income *252 from other sources. [34]
4. Relationship Between Fair Market Value and Price
Fair market value is the price upon which a well informed and willing buyer and seller would agree, dealing at arm's-length, with neither acting under any compulsion to buy or sell. Drybrough v. Commissioner,45 T.C. 424, 429 (1966), affd. 384 F.2d 715 (6th Cir. 1967). As stated earlier, Sanborn and Koala purchased in 1981 each of the master recordings in question from Bullett or JEY, paying a cash down payment equal to the total price previously paid by Bullett or JEY, plus a promissory note in an amount between $ 245,000 and $ 747,000. [35] The sales to Koala were within approximately three months of the purchases by Bullett or JEY, and there is no evidence of any circumstances existing during that interval which had an impact on the masters' fair market value. The *253 multiple sales negotiated by Sanborn were obviously part of a prearranged scheme to grossly inflate both the value of the master recordings and the corresponding investment tax credits. Consequently, we view the purchase prices originally paid by Bullett or JEY for the masters as the best evidence of the maximum amount at which those master recordings would change hands between a willing buyer and seller in an arm's-length sale during 1981. Cf. Guggenhein v. Rasquin,312 U.S. 254, 258 (1941) (cost is cogent evidence of value). See Colonial Fabrics, Inc. v. Commissioner,202 F.2d 105 (2d Cir. 1953), affg. a Memorandum Opinion of this Court, cert. denied 346 U.S. 814 (1953); Brannen v. Commissioner,78 T.C. at 497; Narver v. Commissioner,75 T.C. 53, 96-97 (1980), affd. 670 F.2d 855 (9th Cir. 1982). [36] *255 Stated another way, we find that the fair market value of each master recording in 1981 did not exceed the amount which Koala paid as a cash down payment for the particular master. (See Appendix C.) However, Sanborn's obvious aversion to vigorously negotiating realistic prices, questions as to the masters' title and quality, and Koala's practice of leasing nonexclusive rights in *254 duplicated and reconfigured masters lead us to question whether the true fair market values of the masters at issue at the time of the leases were even less than Koala's cash down payment. Cf. Drybrough v. Commissioner, supra at 429, and cases cited therein (respondent can look behind the value stated in a contract in order to determine value and to prevent tax avoidance). Appendix E sets forth the values of each of the 39 test case master recordings as appraised both by petitioners' appraisers, Robert E. Scherl, Sye Mitchell and Timothy O'Brien; and by respondent's appraisers, Thomas Bonetti and John Wiedenmann. Neither Koala, the partnerships nor petitioners ever received appraisals for 17 of the 39 test case master recordings, and neither Sye Mitchell nor Timothy O'Brien testified at trial regarding any of the remaining 22 masters. [37] Petitioners' third appraiser, Robert E. Scherl, had no experience in performing appraisals of any kind prior to those performed for Koala, and he did not even know how the term "fair market value" was defined. He agreed to prepare the appraisals only because he understood them to be a formality necessary to justify related tax benefits. Because of the large number of masters he was asked to appraise, Mr. Scherl listened only to segments of the masters and frequently chose not to listen to any part of a master. His appraisals do not identify the master recording valuated, but rather refer to each master merely as "the album you have submitted to me." Furthermore, if the appraised value arrived at for any master recording *256 wass less than Koala's purchase price for that master, Mr. Scherl was not to submit, or be paid for, that appraisal. Not surprisingly, the final values arrived at, without exception, exactly matched Koala's inflated purchase prices. At trial, Mr. Scherl even testified that no one would actually pay the appraised amount for any masters "Because the risk/reward ratio is astronomically too great * * * [the appraised values] don't make sense." Needless to say, we are not the least bit persuaded by Mr. Scherl's appraisals in view of the shallowness of his knowledge of the market and his methodology used to appraise the master recordings. Under the circumstances, we find Mr. Scherl's appraisals wholly unreliable and without foundation. Petitioners also rely on the expert testimony of M. William Krasilovsky. The opinions of experts are admissible and relevant to the issue of value, but *257 the opinions must be weighed in light of each expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). This Court may reject expert testimony where, in our best judgment, it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). Mr. Krasilovsky is an attorney who has specialized in the entertainment copyright and music fields since about 1953 and has co-authored a book, The Business of Music, frequently relied upon as a practical guide to the music industry. While his testimony focused on the net profits which an unsophisticated investor could expect in 1981, Mr. Krasilovsky neither attacked respondent's appraisals nor directly offered his opinion as to the value of the masters in question. Perhaps his indirectness can be attributed either to his unfamiliarity with the appraisal process (since he has admittedly seen appraisals only in extremely rare situations) or to his reluctance to justify in good conscience the inflated values alleged by petitioners. Regardless, Mr. Krasilovsky presented no testimony to support the values claimed with regard *258 to the leased masters. [38]
In contrast, we find the valuations given by respondent's experts, Thomas Bonetti and John F. Wiedenmann, to be more indicative of the master recordings' fair market value. Both men are experienced in appraising master recordings. Both listened to each master appraised in its entirety and considered such factors as the artist; the performance; the sound quality; the type of music; whether the masters contained previously released material; and the extent to which masters were duplicated, reconfigured and leased to more than one Koala partnership. Thomas Bonetti arrived at the fair market value of each master by projecting the stream of income for each master, discounted to the present value as of 1981. John F. Wiedenmann, on the other hand, took the market approach to figuring fair market value by determining what price a broker would charge a buyer for the same rights in the same master recordings. In doing so, Mr. Wiedenmann referred to music brokers, *259 various record and music publications, surveys by the National Association of Recording Merchandisers [39] and reports by the Recording Industry Association of America. [40]
Respondent's experts were thorough and professional, and we are persuaded that their appraisals were performed with adequate care and are reasonably accurate. Therefore, we conclude that the fair market value of each of the 39 test case masters at the time they were leased by Koala in 1981 is the greater of respondent's two appraised values for that master, not to exceed the cash down payment made by Koala for that particular master. *260 (Compare Appendix C with Appendix E.) As we stated in Buffalo Tool & Die Manufacturing Co. v. Commissioner,74 T.C. 441, 452 (1980): the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise * * *. There is no factual support for the large values claimed by petitioners. Even petitioners' 1981 investments in the Koala program for simply the nonexclusive rights to lease the masters far exceeded the masters' respective fair market values. Had petitioners made even minimal independent investigation into the representations made to them by Sanborn, LaBine, Klein or other promoters or salesmen, they would have quickly discovered the great disparity between the actual fair market value and the stated value of the masters subject to the leases. See Rose v. Commissioner, supra at 389. [41] By leasing the master sound recordings based on the inflated values, petitioners were immediately placed at a tremendous disadvantage in that, to make a profit, the masters had to generate revenues far in *261 excess of what they feasibly could produce, especially in light of the fact that records and tapes were to be distributed only through rack-jobbers at budget prices. See West v. Commissioner,88 T.C. 152, 161 (1987); Brannen v. Commissioner,78 T.C. at 508. In light of the excessive deductions, losses and credits claimed by petitioners in comparison to their 1981 investment (see Appendix C), it defies reason to suggest that the amounts claimed were indicative of the fair market value of the leased masters without regard to the anticipated tax benefits. See Rose v. Commissioner, supra at 419. 5. Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of lack of economic substance or an exaggeration thereof. Knetsch v. United States,364 U.S. 361 (1960); Rose v. Commissioner, supra at 419; Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). We will examine the substance, not the form, of such debt. Waddell v. Commissioner, supra, and cases *262 cited therein. As previously stated, Sanborn grossly inflated the values of the master recordings through the use of multiple sales and promissory notes. Although the notes were payable "in all events," no payments of principal were required for 12 years. Koala made no payments on the notes, and neither Bullett nor JEY took any action to require repayment of those notes. Koala calculated investment tax credits based on the inflated purchase price, and, although there exists no notes at the partnership level, Koala elected to pass-through the investment tax credits to the respective partnerships. Sanborn negotiated both the sales of the masters to Bullett or JEY and the subsequent sales to Koala with the sole purpose of inflating the values of the masters and, thereby, amplifying the resulting investment tax credits. Knowing how commercially unreasonable the notes were, Sanborn could not have had any intention of ever actually repaying those notes. Therefore the presence of the promissory notes in this case indicates lack of economic substance. [42] *263 6. Perceived Congressional Intent
Petitioners suggest that they were merely taking advantage of Congressionally enacted tax incentives. We are not at all persuaded that Congress had any intention of encouraging investment in master sound recordings like those in question or of encouraging the type of activities and transactions involved in the Koala program. See Rose v. Commissioner, supra at 421-422. [43]
Based upon the above analysis of the dealings between the parties, petitioners' investment activities, the disparity between the tax and economic benefits, the manner in which the values were determined, and the underlying financial structure, we are convinced that the leasing activities lacked business purpose and that the transactions at issue should be disregarded for Federal income tax purposes for lack of economic substance. Therefore, petitioners are not entitled to claim their allocable share of partnership deductions, losses or investment tax credits for the year of their investments, 1981, or in any other year with regards to related carryover losses and/or investment tax *264 credits. This disallowance of deductions extends to those claimed with respect to petitioners' cash payments, including lease payments, made to Koala, the partnerships or MBSI during 1981 to Koala. Such payments merely represent a fee which petitioners paid to purchase tax benefits and, consequently, are nondeductible. Rice's Toyota World, Inc. v. Commissioner, supra752 F.2d at 95, affg. on this issue 81 T.C. at 207, 210; Patin v. Commissioner, supra at 1125. Having found that the transactions at issue lack economic substance for tax purposes, we need not consider the petitioners' other arguments. Patin v. Commissioner, supra at 1127. Inconsistent settlement offers
Next, petitioners maintain that respondent's failure to extend the identical settlement offer to all Koala investors violated the equal protection component of the Fifth Amendment due process clause. The Detroit Appeals Office arrived at a settlement position allowing Koala investors to deduct 60 percent of their out-of-pocket expenses (cash investment) made in 1981. This position was a departure from the previously existing policy of allowing a 100 percent deduction of initial investments made in tax shelters during *265 taxable years prior to 1981. Before the new policy was fully implemented nationwide, various 1981 Koala investors received and accepted settlement offers of the 100 percent out-of-pocket deductions. Petitioners, therefore, insist that they are also entitled to the 100-percent deduction for 1981. We disagree. As a general rule, this Court will not look behind a deficiency notice to examine the evidence used, the propriety of respondent's motives, the administrative policy or procedure followed in making his determinations. Jackson v. Commissioner,73 T.C. 394 (1979); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974); Human Engineering Institute v. Commissioner,61 T.C. 61, 66 (1973), appeal dismissed (6th Cir., April 1, 1975), cert. denied 423 U.S. 860 (1975). However, where unconstitutional conduct by respondent is alleged, the Court has carefully scrutinized the determinations. Riland v. Commissioner,79 T.C. 185, 207 (1982); Proesel v. Commissioner,73 T.C. 600, 605 (1979); Greenberg's Express, Inc. v. Commissioner, supra at 327-328; Human Engineering Institute v. Commissioner, supra at 65-66. But even in instances where there exists unconstitutional conduct *266 on respondent's part, we have refused to declare the deficiency notices null and void. Riland v. Commissioner, supra at 207; Greenberg's Express, Inc. v. Commissioner, supra at 328; Human Engineering Institute v. Commissioner, supra. at 66. Petitioners first argue that the Service is bound by the policies it adopts regarding fair and impartial settlement of cases, and that the Service's failure to follow its own procedures as set out in the Internal Revenue Manual (I.R.M.) is a per se violation of due process.[44] In Riland v. Commissioner, supra at 201, this Court pointed out that not all violations of an agency's internal procedures rise to the level of a constitutional violation. The procedures of the Service do not have the force and effect of law because their purpose is to govern the internal affairs of the Service.[45] *268 Einhorn v. DeWitt,618 F.2d 347, 350 (6th Cir. 1980); Vallone v. Commissioner,88 T.C. 794, 807 (1987). As such, the I.R.M. requirements are merely directory rather than mandatory, and noncompliance does not render respondent's actions invalid. United States v. Horne,714 F.2d 206, 207 (1st Cir. 1983). [46] It is far better to have rules like those contained in *267 the I.R.M. and tolerate occasional errors in their administration than to either have only statutorily mandated rules or have all rules framed in mere precatory language. See Riland v. Commissioner, supra at 202, quoting United States v. Caceres,440 U.S. 741 (1979). Petitioners further claim that respondent violated the equal protection component of the fifth Amendment due process clause by arbitrarily and unjustly discriminating against petitioners during settlement negotiations. In particular, petitioners contend that respondent should have extended to them the same 100 percent out-of-pocket settlement offer previously extended to Koala investors from previous years and to various other 1981 Koala investors. Again, we disagree. We reject petitioners' contention that they should be extended the same settlement offer as was extended to those who invested in Koala during 1979 and 1980. The mere offer of a particular settlement in a previous year does not require respondent to offer the same proposal in a later year. It is well settled that each tax year is independent from any other, and the Commissioner may challenge in a succeeding year that which he condoned or agreed to in a former year. Harrah's Club v. United States,661 F.2d 203, 205 (Ct. Cl. 1981), and cases cited *269 therein. In order to prevail on their allegation regarding the 1981 settlement proposal, petitioners must demonstrate that others similarly situated have been extended a more favorable settlement offer for 1981, based on the same circumstances, and that respondent's discriminatory selection was based on impermissible considerations or an arbitrary classification. Oyler v. Boles,368 U.S. 448 (1962); Penn-Field Industries, Inc. v. Commissioner,74 T.C. 720, 723 (1980), and cases cited therein. Petitioners have failed to demonstrate that there was any selectivity on the part of respondent in extending better settlement offers to others. His settlement offers were not dictated by law, but rather by efforts to reach amicable settlements of a large number of cases efficiently. Respondent does not have to demonstrate that his settlement offers were fair. Petitioners could reject them if they were not. Respondent may have had good reason to lower his settlement offers from year to year such as to curb or reduce the activity of taxpayers in utilizing what respondent considered to be the sham tax shelters. Penn-Field Industries, Inc. v. Commissioner, supra at 723. There is no evidence *270 that respondent was deliberately selective in extending only 60 percent out of pocket settlement offers for 1981 to these taxpayers while offering 100 percent out-of-pocket settlements for other 1981 ventures. The evidence indicates that this was caused by a delay in communication, which may be unfortunate, but is not unconstitutional nor an abuse of discretion. The good faith of respondent and his agents, and the validity of their actions, are presumed; and petitioners have the burden of proving otherwise. Sunday Lake Iron Co. v. Wakefield,247 U.S. 350, 353 (1918), and cases cited therein. Petitioners rely heavily on two cases, Sioux City Bridge v. Dakota County,260 U.S. 441 (1923), and Johnson v. Smith,696 F.2d 1334 (11th Cir. 1983). In Sioux City Bridge, the Supreme Court found a violation of equal protection where the property of one landowner was intentionally and arbitrarily assessed at its true value while the property of other landowners was systematically underassessed. In Johnson, the court of appeals affirmed a district court's writ of mandamus to compel the Attorney General to credit a convict with time served after his conviction but before sentencing. The court *271 of appeals in that case found that pre-sentence and post-sentence detainees were "similarly situated," so that failure to give pre-sentence detainees credit for time served violated the equal protection component of the Fifth Amendment due process clause. The court stated: If two groups are similarly situated, then a rational reason for the disparate treatment must exist in order to avoid a denial of equal protection of the laws. [Johnson v. Smith, supra at 1337; citations omitted.] Unlike the complaining parties in Sioux City Bridge and Johnson, petitioners in the present case have not shown that they were systematically singled out based on any arbitrary classification and were intentionally treated differently than other 1981 Koala investors. Petitioners have not demonstrated that respondent's revenue agents intentionally or knowingly treated 1981 Koala investors inconsistently during settlement negotiations. Rather, we find the present case to be more in line with Sunday Lake Iron Co. v. Wakefield, supra, in which the Supreme Court refused to hold that an unequal tax assessment violated the equal protection clause of the Fourteenth Amendment where plaintiff failed to establish *272 that the disparate treatment was due to anything other than an honest mistake of judgment. The court in that case explained: The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person * * * against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constrained agents. * * * mere errors of judgment by officials will not support a claim of discrimination. There must be something more--something which in effect amounts to an intentional violation of the essential principle of practical uniformity. [Sunday Lake Iron Co. v. Wakefield, supra at 445; citations omitted.] There is no evidence to indicate that the revenue agents in this case intentionally acted discriminatory. Unaware of the new settlement position for 1981 Koala investors, some of respondent's revenue agents at the administrative level in various districts simply continued in good faith to extend the old offer to various 1981 Koala investors. Until the time the new settlement position was adequately communicated to all the Service's district offices and was fully implemented nationwide, the old settlement *273 offer was outstanding and accepted in roughly 125 instances. Petitioners have not carried their burden of showing that the disparate settlement offers were due to anything other than untimely communication of the 1981 settlement position by the Service's Detroit office to its other district offices nationwide. Therefore, we cannot find the administrative actions of respondent's agents in extending inconsistent settlement offers so improper as to be invalid or in violation of the constitution. That being the case, petitioners cannot avoid tax liability by showing that others have been treated generously, leniently or erroneously by respondent; rather, each petitioner must rest on the validity of his own position under the applicable taxing provisions, independently of others. See IBM Corp. v. United States,343 F.2d 941, 919 (Ct. Cl. 1965), cert. denied 382 U.S. 1028 (1966). Our responsibility is to apply the law to the facts of the cases before us and to determine the tax liability of the parties before us. Davis v. Commissioner,65 T.C. 1014, 1022 (1976); Teichgraeber v. Commissioner,64 T.C. 453, 456 (1975). Accordingly, we reject petitioners' equal protection argument. Additions *274 to tax under section 6653(a)
The next issue is whether the section 6653(a) additions to tax determined by respondent for the taxable year 1981 should be sustained. Respondent determined that petitioners, other than petitioners Robert and Laura Parenti, are liable for additions to tax under sections 6653(a)(1) and (a)(2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an additional amount, but only but with respect to the portion of the underpayment attributable to the negligence or intentional disregard. Negligence is defined in section 6653(a)(1) as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). It is not necessary to fully repeat the analysis of petitioners' dealings previously set forth in order for us to conclude that the deficiencies attributable to the master recordings *275 are due to negligence or intentional disregard of the rules and regulations. In leasing the master sound recordings, petitioners paid little attention to the investment they were undertaking. They did not seek advice of anyone as to the propriety or financial merit of the investment. In addition, petitioners did not listen to any of the masters in question prior to leasing them nor did they seek independent appraisals of the worth of those masters. Petitioners' actions did not remotely approach the actions which reasonable and ordinarily prudent persons would have taken under the circumstances, especially in light of petitioners' lack of experience in the field and the amount of their respective investments. Accordingly, the additions to tax under section 6653(a) are fully justified, and respondent is sustained on this issue. Additions to tax under section 6659
Respondent determined that all petitioners, except petitioners Parenti, are liable for the section 6659 additions to tax. Section 6659 imposes a graduated addition to tax whenever an individual has an underpayment of tax which equals or exceeds $ 1,000 and which is attributable to a valuation overstatement. A valuation *276 overstatement occurs "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Section 6659(c). If the claimed valuation exceeds 250 percent of the correct value, then the addition is equal to 30 percent of the underpayment, but only to the extent attributable to the valuation overstatement. Since we have found that the transactions are devoid of economic substance and are to be disregarded for tax purposes, petitioners have no adjusted basis for purposes of the investment tax credit. Therefore, the correct adjusted bases for the master recordings are zero. See Rose v. Commissioner, supra at 426; Zirker v. Commissioner,87 T.C. 970 (1986). Accordingly, an addition to tax equal to 30 percent of the underpayment attributable to the valuation overstatement is appropriate. Section 6659(a) and (b); Zirker v. Commissioner, supra at 979-980. [47] *277 Petitioners argue that respondent abused his discretion by refusing to waive the section 6659 addition to tax. Section 6659(e) provides that the Secretary may waive all or part of the section 6659 addition to tax where the taxpayer shows "that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." The decision of whether to grant or deny the waiver is discretionary and is reviewable only for an abuse of discretion, such as to where the denial of waiver is arbitrary, capricious or unreasonable. Estate of Gardner v. Commissioner,82 T.C. 989 (1984); Hospital Corp. of America and Subsidiaries v. Commissioner,81 T.C. 520, 594 (1983). [48] As indicated earlier, petitioners did not even see the appraisals before they agreed to the lease terms demanded by Koala. We have also discussed at *278 length our reasons for concluding that the values claimed have no basis in reality. Under the circumstances, we see no reasonable basis for the values claimed on petitioners' returns, and we question whether these claims were made ingood faith. Therefore, assuming that respondent's refusal to waive the addition to tax is reviewable by this Court, we reject petitioners' argument that the refusal was an abuse of discretion. [49]
Additional interest under section 6621(c)
In his notices of deficiency to petitioners Tellam and Zingg, respondent determined that the increased rate of interest *279 under section 6621(c) applies. Petitioners Tellam and Zingg bear the burden of proof on this issue. Rule 142(a); Welch v. Helvering, supra.In his respective answers, respondent affirmatively asserts the section 6621(c) interest rate as to petitioners Avers, Dickerson, Hilton and Parenti. Inasmuch as respondent raised the issue in his answer, he bears the burden of proof. Section 6214(a); Rule 142(a); Zirker v. Commissioner, supra at 981. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to one or more tax-motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax-motivated transactions include inter alia, valuation overstatements and deductions disallowed from activities not entered into for profit. Section 6621(c)(3); section 301.6621-2T, *280 Q-4 and A-4, Proced. and Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 59394 (December 28, 1984). Congress specifically amended section 6621(c)(3)(A), adding to the list of tax-motivated transactions "(v) any sham or fraudulent transaction." [50] This Court has recently interpreted the language "any sham or fraudulent transaction" to include transactions where the taxpayer lacked profit motive and which were without economic substance. Patin v. Commissioner, supra at 1128-1129. We have already found that a valuation overstatement within the meaning of section 6659(c) existed with respect to the basis claimed in the masters by each petitioner. We have also held that the transactions in issue were without economic substance and, therefore, were economic shams. Such transactions were clearly "tax motivated transactions" within the purview of section 6621(c). As part of our holding that the transactions lacked economic substance, we have explicitly *281 found that the disputed transactions were not entered into for profit. Accordingly, we also find that the sanction of section 6621(c) is appropriate in these cases. Section 301.6621-2T, A-5 of the temporary regulations provides for the method of computing the additional interest under section 6621(c). The amounts of the underpayments which are attributable to tax motivated transactions will be determined in the course of the Rule 155 determinations. Decisions will be entered under Rule 155.
APPENDIX A
Petitioner
Docket No.
Year
Deficiency
Ronald H. Avers and
12639-86
1978
--
Dorothy A. Avers 1981
$ 7,576.00
Bernadine M. Dickerson
12640-86
1981
3,856.00
Walter L. Hilton and
12641-86
1981
3,488.00
Barbara J. Hilton Robert V. Parenti and
12642-86
1978
1,267.00
Laura S. Parenti 1981
7,310.00
James H. Tellam and
12643-86
1978
--
Fay J. Tellam 1979
--
Dale E. Zingg and
26927-86
1981
81,226.76
and Helen M. Zingg Additions to Tax, I.R.C. 1954
Petitioner
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6621(c)
Sec. 6659
Ronald H. Avers and
$ 73.15
--
--
$ 438.90   Dorothy A. Avers 378.90
* *282 --
2,157.60
Bernadine H. Dickerson
193.25
*
--
840.60
Walter L. Hilton and
174.04
*
--
442.50
Barbara J. Hilton Robert V. Parenti and
--
--
--
--
Laura S. Parenti --
--
--
--
James H. Tellam and
476.14
-- **
2,856.83
Fay J. Tellam 488.80
-- **
2,932.80
861.65 *** **
4,524.00
Dale E. Zingg and
4,061.34
* **
17,375.94
and Helen M. Zingg APPENDIX B
I.R.S. Center Where
Residence When
Federal Income Tax
Petitioner
Docket No.
Petition Filed
Returns Were Filed
Ronald H. Avers and
12639-86
Westland, MI
Cincinnati, OH
Dorothy A. Avers Bernadine M. Dickerson
12640-86
Comstock Park, MI
Cincinnati, OH
Walter J. Hilton and
12641-86
Royal Oak, MI
Cincinnati, OH
Barbara J. Hilton Robert V. Parenti and
12642-86
Stuart, FL
Atlanta, GA
Laura S. Parenti James H. Tellam and
12643-86
Grand Rapids, MI
Cincinnati, OH
Fay J. Tellam Dale E. Zingg and
26926-86
Sterling Heights, MI
Cincinnati, OH
Helen M. Zingg APPENDIX C -- KOALA'S PURCHASE PRICE
MASTER
DATE OF
KOALA'S
KOALA'S
LESSEE
RECORDING
BILL OF SALE
PURCHASE
CASH PAID
PROMISSORY
PARTNERSHIP
(by lease no.)
TO KOALA
PRICE
BY KOALA
NOTE
Almond
938 09-07-81
$ 250,000
$ 2,000
$ 248,000
Leasing
1132
08-31-81
500,000
1,000
499,000
1285
10-23-81
250,000
5,000
245,000
1433
08-31-81
375,000
5,000
370,000
1448
08-31-81
437,500
5,000
432,500
1507
08-31-81
437,500
3,000
434,500
Datura
1234
10-22-81
437,500
5,000
432,500
Distributing
1237
10-22-81
250,000
3,000
247,000
Co.
1286
10-23-81
375,000
3,000
372,000
1287
10-23-81
375,000
1,000
374,000
1368
10-23-81
375,000
1,000
374,000
1384
10-22-81
500,000
5,000
495,000
Filbert
884 09-07-81
468,750
4,170
464,580
Leasing
940 09-07-81
250,000
2,000
248,000
970 10-07-81
250,000
2,000
248,000
1259
09-07-81
437,500
5,000
432,500
1380
09-07-81
250,000
3,000
247,000
1487
09-07-81
437,500
3,000
434,500
Reco
1697
12-20-81
750,000
3,000
747,000
Enterprises
1832
12-20-81
500,000
5,000
495,000
1833
12-20-81
375,000
5,000
370,000
1834
12-20-81
500,000
5,000
495,000
1835
12-20-81
250,000
2,000
248,000
Sherry
1351
11-23-81
312,500
5,000
307,500
Distributing
1358
11-23-81
375,000
5,000
370,000
Co.
1360
11-23-81
250,000
5,000
245,000
1441
11-23-81
375,000
5,000
370,000
1467
11-23-81
437,500
3,000
434,500
1545
11-23-81
375,000
5,000
370,000
1546
11-23-81
312,500
5,000
307,500
1547
11-23-81
250,000
5,000
245,000
Wahoo
1030
09-10-81
500,000
7,500
492,500
Equipment
1042
06-22-81
500,000
10,000
490,000
Distributing
1162
09-04-81
250,000
1,000
249,000
Co.
1178
10-07-81
250,000
3,000
247,000
1219
10-07-81
250,000
3,000
247,000
1232
10-23-81
500,000
5,000
495,000
1428
10-23-81
312,500
5,000
307,500
1505
09-03-81
437,500
3,000
434,500
*283 APPENDIX D -- CLAIMED INVESTMENTS, LOSSES, CREDITS AND REFUNDS
INVESTMENT
PARTNERSHIP
1981
1981 LOSSES
CREDIT
PETITIONER
DOCKET NO.
INVESTED IN
INVESTMENT
GENERATED
GENERATED
Avers
12639-86
Datura
$ 6,180.00 $ 1,003.00 $ 9,375.00 Dist. Co.
Dickerson
12640-86
Almond
4,640.00
886.00
7,031.20
Leasing
Hilton
12641-86
Wahoo Equip.
6,120.00
577.15
9,375.00
Dist. Co.
Parenti
12642-86
SherryDist.
8,000.00
416.00
12,500.00
Co.
Tellam
12643-86
Filbert
22,490.00
4,441.95
15,080.00
Leasing
Zingg
26926-86
RECO
89,395.38
39,375.27
57,050.70
Enterprises
1981
CARRYBACK
PETITIONER
REFUND
YEAR
Avers
$ 8,827.00 1978
Dickerson
3,963.62
--
Hilton
739.61
--
Parenti
5,171.00
1978
Tellam
6,540.00
1978
1979
Zingg
17,432.22
--
APPENDIX E -- APPRAISALS
MASTER
LESSEE
RECORDING
KOALA'S APPRAISAL
RESPONDENT'S
APPRAISALS
PARTNERSHIP
(by lease no.)
SCHERL
MITCHELL
O'BRIEN
BONETTI
WIEDEMANN
Almond
938 $ 250,000
--
--
$ 200   $ 500   Leasing
1132
500,000
$ 500,000
--
5,000
10,000
1285
--
--
--
500
500
1433
--
375,000
375,000
5,000
3,000
1448
--
--
--
200
1,000
1507
--
--
250,000
500
2,500
Datura
1234
--
--
437,500
2,500
3,000
Distributing
1237
--
--
--
1,000
1,000
Co.
1286
--
--
--
2,500
500
1287
--
375,000
375,000
2,500
2,000
1368
--
--
--
2,500
2,000
1384
--
--
500,000
4,000
10,000
Filbert
884 --
--
468,750
500
1,000
Leasing
940 250,000
--
--
500
500
970 250,000
--
--
500
500
1259
--
--
--
500
3,000
1380
--
--
--
500
1,000
1487
--
437,500
--
200
1,000
RECO
1697
--
--
750,000
500
2,000
Enterprises
1832
--
--
--
4,000
10,000
1833
--
--
375,000
500
3,000
1834
--
--
500,000
2,500
5,000
1835
--
--
--
500
500
Sherry
1351
--
--
--
-0-
3,000
Distributing
1358
--
--
--
1,000
1,000
Co.
1360
--
--
--
500
500
1441
--
375,000
375,000
200
3,000
1467
--
437,500
--
500
1,000
1545
--
--
375,000
500
3,000
1546
--
--
312,500
2,000
3,000
1547
--
--
--
500
500
Wahoo
1030
500,000
500,000
--
5,000
4,000
Equipment
1042
500,000
500,000
--
500
2,000
Distributing
1162
--
--
--
1,000
1,500
Co.
1178
--
--
--
500
500
1219
--
--
--
1,000
500
1232
--
--
--
2,500
500
1428
312,500
312,500
--
3,000
3,000
1505
437,500
--
--
1,000
1,000
*284 Footnotes
1. Cases of the following test case petitioners are consolidated herewith: Bernadine M. Dickerson, docket No. 12640-86; Walter L. Hilton and Barbara J. Hilton, docket No. 12641-86; Robert V. Parenti and Laura S. Parenti, docket No. 12642-86; James H. Tellam and Fay J. Tellam, docket No. 12643-86; and Dale E. Zingg and Helen M. Zingg, docket No. 26926-86. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted. ↩
3. Subsection (d) of section 6621↩ was redesnignated subsection (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, section 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. 4. Bullett was incorporated on March 29, 1979 under the name of Koala Production Company, but the name was changed pursuant to Articles of Amendment to the Charter, dated May 9, 1979. ↩
5. During 1981, Schmidt's daughter served as president of JEY until May 13, after which time Schmidt served as president. ↩
6. This reference is to Rev. Rul. 77-397, 1977-2 C.B. 178↩, a ruling which was not issued in relation to the Koala program. No revenue ruling was ever requested by Koala. 7. As used in connection with the Koala program and throughout this opinion, the term "configuration" refers only to the sequence in which songs are arranged on a master recording. Thus, it is important to note that the statement that a master recording has not been previously released in its present configuration is not a warranty that the songs, themselves, have not been previously released. ↩
*. Any ITC not used in a current year can be carried back 3 years and forward 7 years. ** It is suggested that this be prorated over 12 months. Example: If lease signed July 1, deduct only $ 5,000. 8. Donald Boyd was selected as managing agent for 10 partnerships and Paul Sute was selected to manage 8 partnerships. LaBine, through Professional Associates, acted as managing agent for all of the roughly 119 partnerships that he organized in 1981. In 1982, various investors were selected to replace Professional Associates as managing agent because of concerns over conflict of interests and lack of arm's-length dealings. ↩
9. With the exception of two master recordings, LaBine determined which masters would be leased to the roughly 119 partnerships organized by Professional Associates. ↩
10. Although the leases entered into by Wahoo Equipment Distributing Co. are titled, simply, "LEASE," the terms are virtually identical to those entered into by the other partnerships. 11. Investments were generally made in increments of $ 16,000. The fixed portion of rental payments was $ 10,000 for the first year of the lease and $ 1,000 per year for the remaining second through sixth years. ↩
12. In 1982, the managing agents formed Music Auditors and Rack Administrators (MARA) to merchandise and sell record products. MARA entered into a distribution agreement with San Quad, thereby replacing MBSI. The distribution agreement with San Quad was terminated shortly thereafter. ↩
13. Sanborn negotiated with CBS/Columbia Special Products (involving the Springboard, Sceptor and Musicor catalogues), Jerry C. Wilson (involving masters on the Ampex and Buddah labels), Michael Figlio, Joe D. Stevens, and Star Show International. ↩
14. oala purchased the masters in 1981, generally within three months of the date they were purchased by Bullett or JEY. ↩
15. Although petitioners claim that many of the previously released masters were "enhanced" or "sweetened" by altering them in some way, petitioners offered no evidence or substantiation of such activity, the costs incurred thereby, the master recordings involved or the extent to which masters were so altered. ↩
16. In 1985, Koala changed its name to Music Merchandisers, Inc. and filed a petition under Chapter 11 of the Bankruptcy Code in the United States District Court for the Middle District of Tennessee. At no time did Koala make any payments on the promissory notes given to Bullett or JEY. ↩
17. There is some question from the record whether the appraisals were performed before Koala purchased the masters or whether the appraisals were made after Koala received the masters in 1982 and were back-dated. ↩
18. Petitioner Dickerson also attempted to file a Form 1045 which was not accepted for filing by the Service. ↩
19. Parenti's 1981 return and amended return were both prepared by R. W. Klein Co. ↩
20. Petitioners contend that the entities invested in are, technically, joint ventures rather than partnerships. This distinction is of no consequence, since joint ventures are treated as partnerships for Federal income tax purposes. Section 671(a). Petitioners' alternative claim that this Court should nevertheless look to the investor in determining profit motive is, likewise, without merit. The law is clear and well settled, and we refuse to reconsider it at this time. See Brannen v. Commissioner,722 F.2d 695, 703 (11th Cir. 1984), affg. 78 T.C. 471 (1982), and cases cited therein; Resnik v. Commissioner,66 T.C. 74, 81 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977). See also Rosenberg v. Commissioner,T.C. Memo. 1987-441. We take this opportunity to note that no testimony was given at trial by petitioners Avers, petitioner Dickerson, or Peter G. Marretta, the managing agent for one of the test case partnerships.↩
21. See also Deegan v. Commissioner,T.C. Memo. 1985-219; Jaros v. Commissioner,T.C. Memo. 1985-31↩. 22. Section 183(a) provides the general rule that, in the case of an activity not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(b)(1) provides that there shall be allowed those deductions that would be allowable without regard to whether the activity is engaged in for profit, and section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit shall be allowed only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). Section 183(c) defines the term "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." 23. Section 1.183-2(b), Income Tax Regs., lists the following factors to be considered, in addition to all of the facts and circumstances surrounding the activity, in this determination: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity. 24. Although we recognize that this case was tried prior to our decision in Rose v. Commissioner,88 T.C. 386 (1987) and, therefore, focused on profit objective under the factors set forth in section 1.183-2(b), Income Tax Regs., respondent challenged the economic substance of the transactions in question from the beginning. Moreover, both parties cited and considered from the beginning. Moreover, both parties cited and considered Rose in their briefs. Consequently, we do not hesitate to base our analysis on the objective test of economic substance adopted by this Court in Rose. See Gilbert v. Commissioner,T.C. Memo. 1987-165. We note that the same result would have been reached had we based our analysis upon the factors set forth pursuant to section 183. Throughout this opinion, we indicate references to the relevant factors listed in the regulations under section 183. ↩
25. See also Gilbert v. Commissioner,T.C. Memo. 1987-165↩. 26. See also Gilbert v. Commissioner,↩ T.C. lMemo. 1987-165. 27. Petitioners' failure to attempt to obtain any advice of experts that there mere acceptance of information furnished by the promoters and salesmen also indicate that the activities were conducted in an unbusinesslike manner. See section 1.183-2(b)(1) and (2), Income Tax Regs.↩
28. It cannot be established from the record exactly what legal rights Koala actually possessed in the subject master sound recordings. Many of the master recordings ultimately purchased and leased by Koala in 1981 were previously acquired through quit claim procedures and, thus, were subject to existing claims. Also, Koala's rights to numerous masters were challenged in several law suits which were settled out of court without any determination as to title. Furthermore, Koala's own records were inconclusive and unreliable because they were often fragmented and incomplete and contain gaps in the chain of title. ↩
29. As to RECO Enterprises, each partner was expressly granted equal voting power over all partnership matters. Nevertheless, the partners did not become involved in partnership affairs, never exercised their voting power, intended to be passive investors, and deferred completely to Line, the managing agent. Zingg testified at trial as follows: Q. Was there any one person in the partnership that was assigned to carry out the directions of the other partners? A. Basically, Bob Line made it his project and kept us abreast. * * * Q. Okay. Well, what is your understanding of your duties under the lease? A. I didn't get too involved in that, * * *. * * * Q. Okay. After you made your investment in each of the years 1979, 1980 and 1981, was there anything else that you were suppose to do with regard to that investment? A. Any duties with the partnership? Q. Right. A. No
Similarly, Helmut Fredrick Homann, also a partner in RECO Enterprises, testified at trial as follows: Q. Okay. What is your understanding of your duties and responsibilities as an investor? A. Really, it was a passive investment from a standpoint out [sic] that we put up the money for the lease, and they were going to do the marketing. However, that was pretty well it. ↩
30. See Gilbert v. Commissioner,T.C. Memo. 1987-165↩. 31. See n. 12, supra.↩
32. On June 20, 1985, Sanborn was deposed in the U.S. District Court, Eastern District of Michigan, Southern Division, where he testified: Q. * * * "The average master should provide sales of 300,000 units." Are there any comparable sales of masters that you are aware of * * * that in any way support that figure of 300,000 units? A. No, I never intended nor did I ever relate master sales to hypothetical school problems -- record sales. It was simply a mathematical computation. Q. Where did this number, 300,000, come from? A. It's -- it appears to be, as I remember, a calculated break-even point for a calculated problem, hypothetical problem. * * * Hypothetical [sic] backed into figure. * * * Whether there were any facts to support the sales of a master record of 300,000 units or [sic] this. I don't know * * *. ↩
33. We also note that section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit are allowable only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). See n. 24, supra.↩
34. See also section 1.183-2(b)(6)(7) and (8), Income Tax Regs.↩
35. During his deposition on June 20, 1985 (see n. 32, supra), Sanborn testified as follows: Q. Okay. In other words, Bullett [or JEY] would buy [master sound recordings] from a supplier * * * [and] pay cash of some account. Then you would buy from Bullett [and from JEY] and pay them that amount in cash plus a note for the balance of the purchase price? A. Right. Q. Okay. Why did you structure it in that manner? Why did you only put in cash up to the amount that Bullett [or JEY] had expensed for the same master? A. Why not? Q. Why didn't you pay less, if you were going to give them a note in the first place? A. Good point. I don't know. ↩
36. See also Tripp v. Commissioner,T.C. Memo. 1963-244, affd. 337 F.2d 432 (7th Cir. 1964); Hall v. Commissioner, a memorandum Opinion of this Court dated June 25, 1951. 37. On August 6, 1985, Sye Mitchell was deposed in the U.S. District Court for the Eastern District of Michigan, Southern Division regarding his involvement in the Koala program. During that deposition, Sye Mitchell asserted the Fifth Amendment↩ privilege against self-incrimination in response to questions. 38. This Court did not receive an expert witness report of M. William Krasilovsky, and his testimony is properly excludable under Rule 143(f). However, the inclusion of his testimony does not effect our decision. ↩
39. The National Association of Recording Merchandisers is an organization which is comprised of people involved in the distribution and retailing of recorded material and which keeps annual statistics on sales trends within the music industry. ↩
40. The Recording Industry Association of America is an association of music industry manufacturers which performs a number of various services, including anti-piracy activity, public relations, and research and market studies. Annual reports are published which provide, among other things, industry sales volumes and buying trends research information. ↩
41. See also Hawkins v. Commissioner,T.C. Memo. 1987-233↩. 42. For a similar result involving so called "recourse" notes, see McCain v. Commissioner, T.C. Memmo. 1987-285, and Tassistro v. Commissioner,T.C. Memo. 1987-192. 43. See also McCain v. Commissioner,T.C. Memo. 1987-285; Hawkins v. Commissioner,T.C. Memo. 1987-233↩. 44. This argument centers around the alleged violation of respondent's Internal Revenue Manual, Policy Statement P-4-7 (approved December 23, 1960), which provides: Impartial determination of tax liability An exaction by the United States Government, which is not based upon law, statutory or otherwise, is a taking of property without due process of law, in violation of the Fifth Amendment to the United States Constitution↩. Accordingly, a Service representative in his/her conclusions of fact or application of the law, shall adhere to the law and the recognized standards of legal construction. It shall be his/her duty to determine the correct amount of the tax with strict impartiality as between the taxpayers and the Government, and without favoritism or discrimination as between taxpayers. 45. Petitioners misplace their reliance on Accardia v. Shaughnessy,347 U.S. 260 (1954), involving a habeas corpus proceeding in which the applicable procedural rules did have the force and effect of law. 46. See also Bridges v. Commissioner,T.C. Memo. 1983-763; Tucker v. Commissioner,T.C. Memo. 1983-210↩. 47. Section 6659 applies to returns filed after December 31, 1981. Although petitioners filed returns for carryover taxable years 1978 and 1979 prior to January 1, 1982, they are still liable for the additions to tax under section 6659 to the extent that the underpayments of taxes for these years are attributable to the carryback of unused investment tax credits claimed on the return for the taxable year 1981. Nielsen v. Commissioner,87 T.C. 779 (1986). See also McCain v. Commissioner,T.C. Memo. 1987-285↩. 48. See also Secoy v. Commissioner,T.C. Memo. 1987-286; McCain v. Commissioner,T.C. Memo. 1987-285; Noonan v. Commissioner,T.C. Memo. 1986-449↩. 49. In their briefs, petitioners mention that a jury in consolidated refund suits brought by various 1981 Koala investors returned a verdict that respondent was arbitrary and capricious both in imposing the section 6653(a) addition to tax and in failing to waive the section 6659 additions to tax. Boyd, et al. v. United States,↩ 84-CV-1976-DT (E.D. Mich., Jan. 1987). Based on the entire record in this case, we find petitioners subject to those additions to tax. 50. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective with respect to interest accruing after December 31, 1984, the original effective date of section 6621(d), now section 6621(c)↩. *. 50 percent of the statutory interest due on the respective deficiency. ** Amount to be determined. *** 50 percent of the statutory interest due on $ 17,232.91. ↩