Hazel W. BUNCE and The Bank of New York, executors for the Estate of Charlotte B. Major, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 92–399 T.

United States Court of Federal Claims.

June 9, 1993.

David H. Dickieson, Washington, DC, for plaintiffs.

Robert J. Higgins, with whom were Acting Asst. Atty. Gen. James A. Bruton, Mildred L. Seidman, and David Gustafson, Washington, DC, for defendant.

## OPINION and ORDER

TURNER, Judge.

This opinion addresses defendant's motion for summary judgment filed December 9, 1992. We conclude that defendant's motion should be granted.

## I

## A

The material facts are undisputed, though each party interprets them differently. The facts as given here diverge in no important way from the plaintiffs' recitation. Pl. Br. at 4–10.

Charlotte B. Major died in 1984 holding public housing bonds. Her executors, plaintiffs herein, excluded these bonds from their calculation of her taxable estate based on *Haffner v. United States*, 585 F.Supp. 354 (N.D.Ill.1984), *aff'd*, 757 F.2d 920 (7th Cir.1985), the first case to hold that public housing bonds were not taxable at death. The IRS upon audit included the full value of Major's so-called Haffner bonds.

The *Haffner* doctrine, never followed by any other court, was overruled by the Supreme Court in 1988. *United States v. Wells Fargo Bank*, 485 U.S. 351, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988). Before *Wells Fargo* definitively reestablished the taxability of Haffner bonds, the IRS, starting in June 1986, compromised many Haffner bond cases. The New York City Appeals Office, which handled the Major estate, settled 90 percent of its Haffner bond cases by including only 60 percent of the bond value in the taxable estate. Pl. Appendix, Ex. 10. The settlement practice in other regions varied, with some regions settling no Haffner bond cases. *Id.* The widespread compromise of Haffner bond cases came to an end at the latest on April 28, 1987 when the national office of the IRS Appeals Division issued a memorandum instructing all regional appeals offices to stop the settlements. Pl. Appendix, Ex. 9. There is evidence that oral instructions to the same effect were received in the New York City Appeals Office some time earlier. Pl. Appendix, Ex. D at 40–41 (Aff. of Brancato).

Well before the Appeals Division issued instructions to end Haffner bond settlements, a February 27, 1987 discussion between the parties to this litigation resulted in an oral agreement to compromise the Major estate's Haffner bond issue on the New York City office's typical terms, including only 60 percent of the bond value in the taxed estate.[1] During the next few days, representatives of the estate, in consultation with the IRS, calculated the amount due under a 60 percent inclusion. The IRS then provided the plaintiffs with an IRS Form 890–AD, the form for memorializing estate tax compromises. The IRS had filled in the amount due on the Form 890–AD prior to giving it to plaintiffs, but the form was not signed by any IRS official. On March 6, 1987, the executors delivered to the IRS the signed, dated compromise offer ready for signing by the IRS. Attached to the Form 890–AD was a check in full payment of the compromise; this check was cashed on March 9, 1987. The Form 890–AD was never returned to the executors; instead, it was destroyed.

At the same February 27 meeting, IRS Appeals Officer Leonard Hershkowitz told the estate representatives, who were attorneys with a large New York law firm, that he had a daughter in law school seeking employment. One of the lawyers said he would "be glad to forward [the daughter's] resume to [the firm's hiring] committee" and later did so. Pl. Appendix, Ex. B (Aff. of Blattmachr). There was no further communication between the parties on this matter; the Appeals Officer's daughter was not hired by the firm. *Id.* A different law firm represents plaintiffs in this case.

Between March and May, estate representatives made several telephone inquiries of Hershkowitz about the IRS's progress in closing out the Major estate and returning the executed Form 890–AD; during one of these conversations, Hershkowitz said that the closing letter was "in the mail." Pl. Appendix, Ex. A (Aff. of Feigert).

On June 2, 1987, Hershkowitz telephoned estate representatives with news of the April 28, 1987 IRS memorandum ordering an end to Haffner settlements. Hershkowitz informed them that the estate's Haffner bonds were fully taxable.

---

1. The estate's course of negotiation with the IRS during this period has been attested to by one of the estate's lawyers. Pl. Appendix, Ex. A (Aff. of Feigert).

The estate subsequently paid the taxes and interest resulting from inclusion of the remaining 40 percent of Haffner bond value, and then filed a claim for refund of the entire estate tax attributable to the Haffner bonds. Def. Appendix B at 5–9. The IRS denied the refund claim on June 25, 1990. Def. Appendix B at 46.

On April 26, 1987, the estate of another taxpayer holding Haffner bonds submitted its Form 890–AD compromise offer, also to the New York City Appeals Office. Pl. Appendix, Ex. C (Aff. of Vezutto). This offer, like plaintiffs', provided for the inclusion of 60 percent of the Haffner bond value in the taxable estate. The offer was accepted by the IRS on May 11, 1987, two weeks after the nationally circulated memorandum purporting to end all Haffner bond compromises. Plaintiffs now claim a tax refund based on the same 60 percent inclusion deal arranged by this other taxpayer, a deal identical to the one plaintiffs had orally struck with the IRS on February 27, 1987.

### B

Plaintiffs have asserted five counts in their complaint. However, for the purposes of analysis the five counts can be grouped into three somewhat overlapping categories.

Counts I and III compose the first category. While Count I is titled "Breach of Settlement Agreement" (Cplt. at 12) and Count III is titled "Breach of Contract" (Cplt. at 13), the essence of each is the assertion that the facts show there was a binding compromise. Thus, they will be discussed together.

In Count II, plaintiffs assert that "[b]ecause Plaintiff reasonably relied, to its detriment, on statements made and actions taken by the IRS ... [d]efendant is estopped from denying that the Form 890–AD was signed" and accepted in accordance with the relevant Treasury regulations. Cplt. at 13. This estoppel claim constitutes a second category.

Counts IV and V of the complaint make up the third category. Both counts essentially maintain that plaintiffs were improperly discriminated against by the IRS. Plaintiffs' Count IV, titled "Administrative Inconsistency and Discriminatory Treatment" (Cplt. at 14), asserts that the Major estate was treated differently from similarly situated estates because an IRS employee blocked the compromise in an attempt to coerce plaintiffs' lawyers to give his daughter a job. Count V, titled "Abuse of Administrative Discretion" (Cplt. at 17), asserts that IRS delay in processing the compromise offer, together with 1) IRS representations that the estate was about to be "closed out" and that the closing letter had been mailed and with 2) the fact that even after plaintiffs's settlement offer was refused the IRS compromised on identical terms with a similarly situated taxpayer, constitutes an abuse of administrative discretion. Cplt. at 18, ¶ 58. While Count IV focuses on the alleged coercion of plaintiffs' lawyers by the IRS and Count V focuses on other IRS misbehavior, both essentially maintain that plaintiffs were improperly discriminated against, and they will therefore be discussed together.

### II

■ In Counts I and III of the complaint (Cplt. at 12, 13), plaintiffs maintain that a binding compromise or contract arose from the facts described above. We disagree. Even if we assume, as plaintiffs invite us to, that an IRS employee with the authority to compromise cases such as this one signed the Form 890–AD and that the form was then destroyed to keep this fact from plaintiffs, there was no binding agreement. When we accept plaintiffs' facts and inferences as true, there remains no doubt that defendant is entitled to summary judgment on Counts I and III as a matter of law.

### A

■ The IRS is not bound by any agreement which does not comply exactly with compromise procedures provided by statute and regulation. *Botany Worsted Mills v. United States*, 278 U.S. 282, 288–89, 49 S.Ct. 129, 131–32, 73 L.Ed. 379 (1929). The regulation promulgated under the statute granting compromise authority to the IRS

provides that "[o]ffers in compromise shall be submitted on forms [like the Form 890–AD] prescribed by the Internal Revenue Service...." Treas.Reg. (26 C.F.R.) § 301.7122–1(d)(1) (1967) (hereafter Section (d)(1)). Form 890–AD itself provides that "[t]his offer is subject to acceptance by or on behalf of the Commissioner.... It will take effect as a waiver of restrictions on the date it is accepted. Unless and until it is accepted it will have no effect." Def. Appendix B at 31 (Form 890–AD). Acceptance is defined in the regulation: "An offer in compromise shall be considered accepted *only when the proponent thereof is so notified in writing.*" Treas.Reg. (26 C.F.R.) § 301.7122–1(d)(3) (1967) (hereafter Section (d)(3)) (emphasis added).

■ Therefore, in an estate tax case, once an offer in compromise has been submitted to the IRS on Form 890–AD, the offer is accepted when the IRS so notifies the taxpayer in writing. Here, it is undisputed that plaintiff was never notified in writing that its offer had been accepted. Plaintiffs' dark speculations on whether the destroyed form was signed are immaterial because the acceptance would have been effective not upon signing, but rather upon delivery to the taxpayer, which never occurred.

### B

■ In arguing that a binding compromise was created in this case, plaintiffs alternatively contend that the circumstances indicate that the IRS, rather than the estate, was the Section (d)(3) proponent of this compromise offer. Under this anal-ysis, the IRS made an oral offer to plaintiffs to compromise the case by including only 60 percent of the Haffner bond value; the IRS offer was then formalized when the IRS provided plaintiffs with a Form 890–AD with the amount due filled in; and the estate then duly gave the IRS written notification of acceptance, as required by Section (d)(3), when it submitted the Form 890–AD. As a legal matter, this theory cannot prevail. The United States cannot be the proponent of a compromise offer in the context of Treas.Reg. (26 C.F.R.) § 301–7122–1 (1967).[2]

When plaintiffs' facts are accepted, defendants are entitled to judgment as a matter of law on Counts I and III, since the IRS never accepted the compromise offer. There is no genuine issue on the point of whether a binding compromise was ever reached.

### III

Plaintiffs' claim in Count II that the government is estopped from denying the existence of a binding compromise is misconceived. Cplt. at 13; Pl. Br. at 2 n. 1. Plaintiffs have failed to show the existence of a genuine issue as to whether they relied to their detriment on government misrepresentation. As will be discussed below, such detrimental reliance is necessary to any estoppel claim. Likewise, the plaintiffs' allegations fail to demonstrate the potential to show the extreme circumstances necessary to prove estoppel against the government. Analysis demonstrates that even accepting plaintiffs' factual contentions as true and drawing inferences

---

**2.** This can be inferred from the text of the regulation, which states that offers "should generally be accompanied by a remittance...." Section (d)(1). In a deal compromising tax liability, the IRS would never be paying the taxpayer. This indicates that the offeror or proponent of the compromise is always a private party. This conclusion is reinforced by Treas. Reg. (26 C.F.R.) § 301–7122–1(d)(4) (1967) which provides that "[i]f an offer ... is ... rejected, the amount tendered with the offer ... shall be refunded [i.e. to the payer of the tax] ... unless the taxpayer ... agreed that the amount tendered may be applied to the liability...." These portions of the regulation make clear that the offeror, or proponent, is usually the taxpayer. The word "proponent" is used in Section (d)(3) instead of "taxpayer" not because the IRS can be the proponent, but because another private party such as an assignee may want to settle a taxpayer's liability. *Ralston Steel Corp. v. United States,* 169 Ct.Cl. 119, 128–29, 340 F.2d 663, 669, *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965) (dictum).

Under the compromise procedure provided for by Section (d)(3), the private party proponent of the settlement submits the Form 890–AD to the IRS. The IRS then must decide whether to accept the proponent's offer. This procedure cannot be deviated from. *Botany Worsted Mills,* 278 U.S. at 288–89, 49 S.Ct. at 131–32.

therefrom generous to plaintiffs, no genuine issue exists, and it is plain that defendant is entitled to summary judgment as a matter of law on Count II.

### A

The Supreme Court in 1990 appeared to lay down a clean rule that citizens seeking cash from the government could not win by estoppel: "claims for estoppel cannot be entertained where public money is at stake...." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 427, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990) (hereafter *Richmond*). However, the Federal Circuit recently determined that *Richmond* did not make such a broad ruling and that the conclusion that *Richmond* "stands for the proposition that equitable estoppel will not lie against the government for any monetary claim" is erroneous. *Burnside–Ott Aviation Training Center, Inc. v. U.S.*, 985 F.2d 1574, 1581 (Fed.Cir. 1993). *Burnside–Ott* is based on the concept that some rights to payment of money from the Treasury are "not based upon a statutory entitlement." *Id.* For instance in *Burnside–Ott*, the plaintiff's claim was said to be based on a contractual entitlement, not a statutory entitlement. Under the Federal Circuit's reading, the holding in *Richmond* bars only estoppel claims seeking payment " 'contrary to a *statutory* appropriation.' " *Id.*, (quoting *Richmond*, 496 U.S. at 424, 110 S.Ct. at 2471) (emphasis partially deleted). We follow the *Burnside–Ott* precedent and therefore must inquire whether in this case there is a genuine issue as to the existence of an estoppel claim. We find there is not.

### B

■ Here, plaintiffs' allegations do not satisfy all the elements of an estoppel.[3] One requisite of a successful estoppel claim is that the party seeking estoppel protection have reasonably relied to its detriment

on the adversary's conduct. *Lyng v. Payne*, 476 U.S. 926, 935–36, 106 S.Ct. 2333, 2339–40, 90 L.Ed.2d 921 (1986); *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 59, 61–63, 104 S.Ct. 2218, 2223, 2224–2225, 81 L.Ed.2d 42 (1984). In this case, plaintiffs make only a vague claim that the Form 890–AD was signed "in reliance," without alleging a specific detriment. Cplt. ¶ 13.

■ Having to pay taxes which are legally assessed does not constitute the type of detrimental reliance necessary to invoke estoppel. *Boulez v. Commissioner*, 76 T.C. 209, 215, 1981 WL 11356 (1981) (stating that "[t]he mere fact that petitioner ... paid taxes ... which he might otherwise have not ... is not ... a sufficient detriment to warrant ... estoppel"), *aff'd on other grounds*, 810 F.2d 209 (D.C.Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The reliance in a successful estoppel typically has caused the claimant to lose a legal right. *Heckler*, 467 U.S. at 61–62, 104 S.Ct. at 2224–2225. In the tax area, this usually means that false information has led the estoppel claimant to allow a statute of limitations to run. *Stair v. United States*, 516 F.2d 560, 564 (2d Cir.1975) (estopping taxpayer); *Miller v. United States*, 500 F.2d 1007 (2d Cir. 1974) (estopping IRS); *Vestal v. Commissioner*, 152 F.2d 132, 136–37 (D.C.Cir.1945) (estopping IRS). The only legal right taxpayers give up when they sign a Form 890–AD compromise is the right to sue in the Tax Court.[4] Plaintiffs' generalized claim of detrimental reliance thus must be premised on the release of their right to sue in the Tax Court.

But the only time plaintiffs might reasonably have considered themselves bound by the Form 890–AD terms was between their March 6 submittal of the Form 890–AD and the IRS's June 2 telephone call informing the plaintiffs that their offer would not be accepted. Since no filing

---

**3.** For a full discussion of the elements of estoppel against the government, see *Clifton Peters v. United States*, 28 Fed.Cl. 162, 168–170 (1993).

**4.** "I understand that by my signing this form, the estate will not be able to petition the United

States Tax Court, unless additional deficiencies are determined...." Def. Appendix B at 31 (IRS Form 890–AD).

deadline ran during this period, the plaintiffs' factual contentions fail to show any potential detriment of the type necessary for a successful estoppel claim.[5]

### C

Plaintiffs claim that IRS misconduct in this case was so gross as to estop the government from denying that a binding agreement was reached. Pl. Br. at 10.

In considering such a claim,[6] we note that "it is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. Even had plaintiffs' reliance on IRS misconduct resulted in sufficient detriment to have invoked estoppel against a private party, none of the bad acts alleged here would create the "extreme circumstances" necessary to support an estoppel claim against the government. *Richmond*, 496 U.S. at 434, 110 S.Ct. at 2476.

Plaintiffs claim to have "documented a cauldron of deceit and document destruction by IRS officials which violates IRS policies" and therefore estops the government from denying that a binding agreement was reached. Pl. Br. at 2 n. 1. Plaintiffs' "cauldron" of allegations contains the following: 1) the improper destruction of the Form 890–AD; 2) the lie told by an IRS officer when he informed estate representatives that the closing letter was in the mail; 3) the IRS's violation of the requirements of Treas.Reg. (26 C.F.R.) § 301–7122–1(d)(4) (1967) (hereafter Section (d)(4)) that a) the proponent of a compromise be promptly notified in writing when the offer is rejected and that b) any payment accompanying a rejected offer be returned rather than cashed and credited to the taxpayer's account; 4) the unconscionable delay in processing the compromise offer; and 5) the alleged fact that the IRS appeals officer's actions in this case were guided by his attempt to get his daughter a job at the law firm representing the Major estate.

This last accusation will be dealt with separately, but taking plaintiffs' four other allegations of an IRS "cauldron of deceit" one at a time, we note: 1) as discussed above, the destruction of the Form 890–AD is immaterial; 2) oral information from the government, such as Hershkowitz's telephone comment that the closing letter was in the mail, cannot usually form the basis for a reliance claim, *Heckler*, 467 U.S. at 65, 104 S.Ct. at 2226, nor does this misrepresentation in any case constitute the affirmative government misconduct required for estoppel; 3) the IRS's failure to promptly notify plaintiffs of the rejection of their offer and failure to return the amount tendered with the settlement offer are both plain violations of Section (d)(4), but even together they do not add up to the extreme circumstances required under *Richmond*, in part because no serious injury to plaintiffs resulted; *see Bowling v. United States*, 510 F.2d 112 (5th Cir.1975) (holding that cashing tax checks does not produce a binding compromise); *Hughson v. United States*, 59 F.2d 17 (9th Cir.), cert. denied, 287 U.S. 630, 53 S.Ct. 82, 77 L.Ed. 546 (1932) (same); and 4) a three-month delay in processing an offer for compromise of tax liability is unfortunate, but is neither unusual in dealing with the IRS nor evidence of affirmative misconduct; *Avers v. Commissioner*, 55 T.C.M. (CCH) 678, 694, 1988 WL 36567 (1988) (stating that delay in processing settlement is unfortunate, but not an abuse of discretion). Suffice it to say that even when we assume the truth of all the contents of plaintiffs' "cauldron," there is no genuine issue which would require the denial of summary judgment for defendant in this case.

---

5. Even if plaintiffs had actually lost their right to sue in Tax Court, any such detriment would be of little or no weight in deciding whether the government was estopped because the plaintiffs could still sue here and in the district courts. *Boulez*, 76 T.C. at 215–16.

6. The claim of affirmative government misconduct, while central to plaintiffs' estoppel argument, is also connected to Counts IV and V of plaintiffs' complaint maintaining that the IRS improperly discriminated against plaintiffs. Therefore, our discussion in parts III C and D of this opinion is also relevant to our consideration of Counts IV and V.

### D

■ Plaintiffs' fifth allegation, the accusation that the IRS actively blocked the compromise agreement in an effort to coerce plaintiffs' lawyers into hiring an IRS officer's daughter, is worthy of separate discussion because of its seriousness. It is the only one of plaintiffs' allegations that possibly could rise to the level of the "extreme circumstances" needed to estop the government. *Richmond,* 496 U.S. at 434, 110 S.Ct. at 2476.

Here, however, plaintiffs have failed to show that this accusation presents a genuine issue precluding summary judgment. Once the party moving under RCFC 56 has established a preliminary case for summary judgment, as it has here by pointing to evidence seeming to show that no IRS coercion took place, Def. Appendix C, Exs. 2 and 3 (Affs. of Feigert and Blattmachr); *Id.* Ex. 5 (Letter from Blattmachr to Hershkowitz), the burden shifts to the opposing party to "set forth specific facts showing that there is a genuine issue ..." RCFC 56(f). "[T]he party opposing the summary judgment motion does not have the right to withhold his evidence until trial...." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2739, at 521 (1983). This is especially true when the facts which might tend to show a genuine issue are readily available to the party opposing summary judgment.

Here, plaintiffs have not substantiated their charge of improper influence with even a shred of evidence. On the contrary, plaintiffs' own affidavits show that the attorneys representing the estate were never contacted by the IRS regarding a job after their initial agreement to forward a resume to the firm hiring committee. Pl. Appendix, Exs. A and B (Affs. of Feigert and Blattmachr). In this case the affidavit filed by plaintiffs pursuant to RCFC 56(g), purporting to show why they should not now be expected to present evidence of a genuine issue, is unconvincing. Pl. Appendix, Ex. E. There is no need to deny summary judgment or allow additional discovery in order for plaintiffs to investigate how their own lawyers were influenced.

### IV

■ The plaintiffs, in Counts IV and V of the complaint (Cplt. at 14, 17), maintain that because another Haffner bond estate which submitted its Form 890–AD later than plaintiffs received the same 60 percent inclusion compromise which plaintiffs had sought, the IRS failed in its duty to treat similarly situated taxpayers consistently. However, defendant has pointed to evidence that plaintiffs were not singled out for discriminatory treatment, and that indeed many IRS regional offices were not at the time compromising any Haffner bond cases. Def. Appendix C, Ex. 8 (Internal Mem. of Pl. Law Firm); Pl. Appendix, Ex. 10 (IRS Mem.). Plaintiffs fail to show a genuine issue on this point, and their affidavit filed pursuant to RCFC 56(g) purporting to show why they should not now be expected to show such an issue is utterly unconvincing. Pl. Appendix, Ex. E.

■ A duty of administrative consistency certainly exists; the tax laws must be interpreted and applied as uniformly as possible.[7] As with the interpretation and application of tax laws, a duty of administrative consistency is also owed in the realm of tax compromises. However, there exists a fundamental difference between the type of discretion Congress grants the IRS to interpret or apply tax laws and the

---

**7.** *Sunday Lake Iron Co. v. Wakefield,* 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918) (holding that county must use the same method of property assessment for all similar owners); *Baker v. Commissioner,* 787 F.2d 637, 640 (D.C.Cir. 1986) (noting IRS conceded that "camp exclusion" for living in a hardship area cannot be denied to taxpayer while being accorded to his fellow employees); *Sirbo Holdings, Inc. v. Commissioner,* 476 F.2d 981; 987 (2d Cir.1973) (holding that IRS cannot concede capital gains treat-

ment to one taxpayer and deny it to another who received an identical payment); *International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 373–74, 343 F.2d 914, 924 (1965) (stating that similar manufacturers must be given the same excise tax treatment for any given tax period), *cert. denied sub nom. United States v. International Business Machines Corp.,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966); *Exchange Parts Co. v. United States,* 150 Ct.Cl. 538, 543, 279 F.2d 251, 254 (1960) (same).

type of discretion granted to compromise tax cases. For clarity, we will refer to the first type of administrative discretion as *interpretive discretion* and to the second type as *settlement discretion.*

 In exercising its interpretive discretion, the IRS might have the discretion to decide whether or not an item is taxable, but once that decision is made, it must be applied equally to all taxpayers. *International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied sub nom. United States v. International Business Machines Corp.,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) (hereafter *IBM*). Settlement discretion, on the other hand, is at its heart a discretion to treat similarly situated taxpayers differently. Settlement discretion, unlike interpretive discretion, includes discretion to weigh the cases of similarly situated taxpayers individually. It is easy to imagine, for instance, that the IRS or one of its regional offices might for administrative or strategic reasons want to settle small cases differently from legally identical cases with larger amounts at stake. Accordingly, there is not even an obligation on the part of the IRS to treat co-investors in the same venture equally for settlement purposes. *Avers,* 55 T.C.M. (CCH) at 693–94.

 Thus while taxpayers have a legal right to uniform interpretation of the laws, citizens who seek to compromise their tax liability have no legal right to a settlement. *Avers,* 55 T.C.M. (CCH) at 693 (stating that IRS settlement offers are "not dictated by law"). This does not mean taxpayers seeking to compromise disputed cases are at the full mercy of the IRS. While there may be no right to a settlement of one's tax liability, there is a right not to be discriminated against in seeking a settlement with the IRS.

 Though no appellate court has ruled on the matter and this appears to be the Court of Federal Claims' first settlement discretion case, a number of Tax Court cases which we discuss below have held that the IRS in seeking compromise is limited by the strictures of the equal protection doctrine. This means that in the Tax Court, any IRS selectivity in settlement is subject to a duty of fairness stemming from taxpayers' rights under the due process clause of the Fifth Amendment, which was in *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), linked to the concept of equal protection.

In the first of its line of settlement discretion cases, *Penn–Field Industries, Inc. v. Commissioner,* 74 T.C. 720, 1980 WL 4468 (1980), the Tax Court, relying on due process precedent in criminal cases, held that to prevail on an allegation of improper IRS selectivity in audits, settlements, and litigation, the taxpayer:

> [M]ust meet *both* requirements of a two-pronged standard. It must *first* demonstrate that, while others similarly situated have not generally been selected … it has been singled out [for adverse treatment], and *second,* that the Commissioner's discriminatory selection of it has been based upon impermissible considerations such as race, religion, or the desire to prevent the exercise of constitutional rights.

*Id.* at 723.

Other Tax Court cases defining the Commissioner's duty of fairness in settling with similarly situated taxpayers have followed the *Penn–Field* analysis requiring proof of discrimination. *Fresoli v. Commissioner,* 55 T.C.M. (CCH) 1624, 1626, 1988 WL 83933 (1988) (holding that disparate treatment will not breach the duty of consistency if no discrimination was shown); *Avers,* 55 T.C.M. (CCH) at 692–94 (same). *See also Jaggard v. Commissioner,* 76 T.C. 222, 226–28, 1981 WL 11348 (1981) (discussing general duty of consistency without reference to settlement cases but deciding case on other grounds); *Davis v. Commissioner,* 65 T.C. 1014, 1022–23, 1976 WL 3750 (1976) (same).

These Tax Court cases indicate that in settling tax cases, the IRS breaches its discretionary standard not only when a suspect equal protection classification such as race or religion is used to differentiate

between taxpayers, but also when any irrational or arbitrary classification is used.[8]

This is strongly reminiscent of the analysis in IRS abuse of interpretive discretion cases, which holds that the necessity for a " 'rational basis' " in distinguishing between similarly situated taxpayers is "central to the administration" of tax laws providing interpretive discretion to the IRS. *IBM*, 343 F.2d at 920 (quoting *United States v. Kaiser*, 363 U.S. 299, 308, 80 S.Ct. 1204, 1210, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring)).

In both the Tax Court's discriminatory settlement cases and the more usual abuse of interpretive discretion cases, the evil sought to be mitigated is discriminatory treatment of similarly situated taxpayers. *Compare Avers*, 55 T.C.M. (CCH) at 693 (requiring "discriminatory selection" before relief can be granted) *and Fresoli*, 55 T.C.M. (CCH) at 1626 (stating that plaintiffs must show "invidious discrimination" to prevail) *and Penn–Field*, 74 T.C. at 723 (same) *with Sirbo Holdings Inc. v. Commissioner*, 476 F.2d 981, 987 (2d Cir.1973) (*Sirbo I*) (stating that taxpayers are "entitled to a non-discriminatory administration of the tax laws") *and IBM*, 343 F.2d at 923 (finding "unjustifiable discrimination" and granting relief to taxpayer) *and Exchange Parts Co. v. United States*, 150 Ct.Cl. 538, 543, 279 F.2d 251, 254 (stating that taxpayer cannot be "made the object of prejudicial discrimination").

The interpretive discretion cases are often couched in the language of equal protection. *Sirbo Holdings, Inc. v. Commissioner*, 509 F.2d 1220, 1222 (2d Cir.1975) (*Sirbo II*) (stating that "even-handed treatment should be the Commissioner's goal"); *IBM* 343 F.2d at 920 (citing "[e]quality of treatment" as the goal); *Id.* at 923 (noting that "fairness called upon the Commission-

er ... to establish a greater measure of equality").

■ For these reasons, we recognize the Tax Court's approach to the settlement discretion problem as persuasive, fair and in concert with leading Court of Claims cases on abuse of administrative discretion such as *IBM* and *Exchange Parts*. Therefore, to prevail on its abuse of settlement discretion claims, the plaintiffs must show both 1) that other similarly situated taxpayers have received more favorable settlements *and* 2) that the IRS intentionally singled out plaintiffs for arbitrary or irrational reasons.

Bearing these legal elements of plaintiffs' abuse of discretion claim in mind, we find that the defendant has pointed to evidence that plaintiffs were not singled out, and rather that many similarly situated taxpayers across the country were not able to compromise Haffner bond cases. Def. Appendix C, Ex. 8; Pl. Appendix, Ex. 10. Even though the majority of Haffner bond cases handled by the New York City Appeals Office during the period in question were settled, defendant has made an initial showing that the IRS did not intentionally discriminate against the Major estate, but rather followed its usual neutral procedures. Def. Appendix B at 25–27 (Aff. and Mem. of Brancato). The plaintiffs have failed to bring forth any evidence that might establish a genuine issue on this point, and have failed to show good reason why they should not now be expected to demonstrate a genuine issue. There is no reason to deny summary judgment on Counts IV and V.

**V**

■ It remains intuitively troubling that after the nationally circulated IRS memorandum of April 28, 1987 purporting to end all Haffner bond settlements the

---

**8.** *Fresoli*, 55 T.C.M. (CCH) at 1626 (implying that "arbitrary classification," like constitutionally impermissible considerations, can create improper discrimination); *Avers*, 55 T.C.M. (CCH) at 694 (noting that a " 'rational reason for the disparate treatment must exist' " to avoid invalid discrimination) (quoting *Johnson v. Smith*, 696 F.2d 1334, 1337 (11th Cir.1983)); *Id.* (implying

that "abuse of discretion" can create improper discrimination); *Id.* (stating that showing an "arbitrary classification" and that taxpayers were "intentionally treated differently" would create improper discrimination); *Penn–Field*, 74 T.C. at 723 (stating that "unjustifiable standard[s include] race, religion, *or other arbitrary classification*") (emphasis added).

agency in fact did settle such a case on terms identical to those sought here by plaintiffs.[9] But this concern does not survive scrutiny in any way that benefits plaintiffs.

As discussed above, the discretion vested in the IRS to settle tax cases is by its very nature a discretion to treat similarly situated taxpayers differently. Within the constraints imposed by regulation and the equal protection or abuse of discretion doctrine, the authority of the IRS to compromise cases of disputed liability has long been absolute. The "power to compromise clearly authorizes the settlement of *any case* about which uncertainty exists as to liability or collection." Op. A.G. 7, 13–2 C.B. 445, 446 (1934) (emphasis added).

■ This permissive rule is still in effect, as reflected in the regulation which authorizes tax case settlements: "*Any such liability may* be compromised...." Treas.Reg. (26 C.F.R.) § 301–7122–1(a) (1967) (emphasis added). Therefore the only judicial inquiry in evaluating the propriety of an IRS refusal to settle is whether or not the taxpayer has been improperly discriminated against. It does not avail the claimant to point to others who have received more favorable treatment. The IRS may compromise with a taxpayer, but is not thereby required to offer the same—or even any—deal to other taxpayers. When settlement is at issue, as long as there has been no abuse of discretion or other invalid discrimination:

> [P]etitioners cannot avoid tax liability by showing that others have been treated generously, leniently or erroneously by [the IRS]; rather, each petitioner must rest on the validity of his own position under the applicable taxing provisions, independently of others.

*Avers*, 55 T.C.M. (CCH) at 694 (citing *IBM*, 343 F.2d at 919). *See also Baker v. Commissioner*, 787 F.2d 637, 644 (D.C.Cir.1986) (noting in a fee award case that each IRS office has leeway to decide whether to settle and that different IRS agents cannot "be expected to march in lock step"); *Davis*, 65 T.C. at 1022 (stating that "how the Commissioner may have treated other taxpayers has generally been considered irrelevant" in determining tax liability).

■ While the analysis in abuse of interpretive discretion cases starts from the premise that all similarly situated taxpayers are entitled to identical treatment, the analysis in abuse of settlement discretion cases starts from the premise that differential treatment is valid if there is no improper discrimination. If simply showing that the IRS settled with another similarly situated taxpayer were enough to prove discrimination, the IRS would be stripped of any real discretion to settle: the compromise of one case would mean all similarly situated taxpayers were legally entitled to the same settlement. Here, the defendant has made an initial case that IRS procedures were neutrally followed. Def. Appendix B at 25–27 (Aff. and Mem. of Brancato). Plaintiffs' evidence that another taxpayer was granted a settlement even after the IRS declared a non-binding internal policy of not settling Haffner bond cases does not by itself show the potential to prove at trial an IRS intent to discriminate against plaintiffs. Plaintiffs have shown no such potential.

## VI

For the foregoing reasons, defendant's summary judgment motion filed December 9, 1992 is GRANTED. Accordingly, judgment shall be entered in favor of defendant.

Pursuant to RCFC 54(d), costs shall be allowed to the defendant ("the prevailing party").

---

9. Unlike a Treasury Regulation, an internal IRS policy does not bind the IRS. *Boulez v. Commissioner*, 810 F.2d 209, 214–16 (D.C.Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). Thus, to the extent plaintiffs believe the April 28, 1987 memorandum binds the IRS, they are mistaken.